

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-3-2006

# Ghebrehiwot v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-3847

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Ghebrehiwot v. Atty Gen USA" (2006). *2006 Decisions.* Paper 151.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/151

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 05-3847

MELAKE ZERAI GHEBREHIWOT,

Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES,

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals
(Agency File No. A97 447 731)

Argued: July 13, 2006

Before: SLOVITER, McKEE and RENDELL,
<u>Circuit Judges</u>

(Opinion filed: November 3, 2006)

MIKAEL ABYE, ESQ. (Argued)
Shearman & Sterling LLP

1

525 Market Street, Suite 1500
San Francisco, CA 94105
Attorneys for Petitioner

CHRISTOPHER J. CHRISTIE, ESQ.
RICHARD M. EVANS, ESQ.
United States Attorney
District of New Jersey
DOROTHY J. DONNELLY, ESQ.  (Argued)
Assistant United States Attorney
402 East State Street
Trenton, NJ 08608
Attorneys for Respondent

OPINION

McKEE, Circuit Judge.

Melake Zerai Ghebrehiwot, a Pentecostal Christian who is a citizen of Eritrea,  petitions for review of an order of the Board of Immigration Appeals affirming without opinion the Immigration Judge's denial of his applications for asylum, withholding of removal and relief under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").  For the reasons that follow, we will grant the petition and remand for further proceedings consistent with this opinion.

## I.  FACTUAL  BACKGROUND

Ghebrehiwot traveled to the United States from Sweden

2

as a visitor for pleasure under the Visa Waiver Program, 8 U.S.C. § 1187, on December 7, 2004. He was denied admission because he presented a false Italian passport that had been manufactured for him. After being referred to an Immigration Judge he sought relief from removal by petitioning for asylum, withholding of removal and relief under the CAT.

Ghebrehiwot was born in Asmara, Eritrea in 1983, and is one of eight children. His parents and all of his siblings still live in Eritrea. Before he left Eritrea, Ghebrehiwot had attended a university where he trained to become a teacher.

After living in Sudan for a number of years, Ghebrehiwot traveled to Sweden and then to the United States with the assistance of a person named, "Abraham." Ghebrehiwot testified that Abraham gave him the false Italian passport he presented upon attempting to enter the United States. Ghebrehiwot used that passport to travel from Sweden to the United States.[1] Abraham bought Ghebrehiwot's airline ticket and told him to come to the United States. Abraham instructed Ghebrehiwot to return the passport to him if admitted without any problems, and he instructed Ghebrehiwot to apply for asylum if asked about the fake Italian passport. Ghebrehiwot did just that when he encountered a problem at the airport. During the ensuing airport interview, Ghebrehiwot said that he feared returning to Eritrea because he had fled to Sudan while a soldier in the Eritrean army. He also said that he had

---

[1] Ghebrehiwot concedes that he has no connection with Italy.

been mistreated in Sudan because of his religion. When asked if he feared returning to Eritrea or the country of last residence, Ghebrehiwot answered: "Yes, because they don't know me as a Eritrean. I don't have nothing. If I go home and I show them where I live and they find out that I fled to Sudan they will kill me."

On his application for asylum, Ghebrehiwot listed both political opinion[2] and religion as the basis for asylum and withholding of removal. He explained as follows when asked about fearing torture: "as Amnesty International is concerned that if I returned back I will be at serious risk of human right violations by the government like hard detention will follow . . . In Sudan, due to religious practicing as before I will suffer until killed by the Sudan government." In his application, Ghebrehiwot stated that he is a member of the Pentecostal Rhema Church in Asmara.

At the hearing before the Immigration Judge, Ghebrehiwot testified that his schooling was cut short because he was drafted into the Eritrean army in 2001. However, he admitted that he had practiced his Pentecostal religion without any problems while in his home country before being conscripted into the army. He also admitted that his family had not experienced any problems in Eritrea. He had heard from his family after leaving Eritrea, while he was still living in Sudan.

---

[2] He does not elaborate upon this, or explain the nature of his political opinion.

4

During the hearing, the Immigration Judge asked Ghebrehiwot whether his family told him anything important he wished to tell the court.[3] The government claims that Ghebrehiwot told the IJ that he "forgot." However, Ghebrehiwot claims that the government has misstated the record. According to him, "the interpreter said that he had forgotten something and Mr. Ghebrehiwot responded that his family had provided him with documentary information."

Ghebrehiwot claimed that being drafted into the Eritrean army was tantamount to mistreatment because he was young and had not finished school. He had been drafted during a war between Eritrea and Ethiopia. After being drafted, he was stationed on the border between Ethiopia and Sudan. He claimed that approximately a month after being drafted, he and seven other Eritrean soldiers were forced to flee into Sudan when the advancing Ethiopian forces penetrated to the Eritrean border. Ghebrehiwot claimed that once he was in Sudan, they could not return to Eritrea because Ethiopian forces continued to occupy the border.

In Sudan, Ghebrehiwot and the others met a fellow Eritrean who took them to Khartoum, the capital city. There, Ghebrehiwot was taken in by "Pastor Josieth" and became part of a Protestant Christian Community. Ghebrehiwot continued to live in Sudan although he never obtained legal residency there. He testified that he never applied for legal residency because "in order to be able to request that, [one must] have. .

---

[3] Ghebrehiwot appeared at the hearing *pro se*.

5

. a passport."

Ghebrehiwot explained that, although Christians live in Sudan, it is an Islamic country, and he was Protestant. Ghebrehiwot claimed that, in June 2002, while he was still living in Sudan, members of the Sudanese army took him from the church he was attending, detained him in an underground jail, and drastically limited his access to food and sanitation facilities. While detained, he and four others were beaten with a hard plastic object. He claimed that, as a result of the beating, his leg was injured, and he was taken to a hospital for one hour – the maximum time allowed for a hospital visit – to receive stitches. According to his testimony, he was then immediately returned to detention where he was denied access to any additional treatment or medication.

Ghebrehiwot was released from prison with the assistance of people working with the Eritrean Liberation Front ("ELF"), an exiled party working in opposition to the Eritrean government. He claimed that he was released on condition that he and the others would stop practicing Christianity. Upon his release, the ELF loyalists gave him an identification card that was valid for 3 months. However, according to his testimony, that card was never renewed because he did not participate in ELF activities due to his religious beliefs.

Following his release, he continued living with the Sudanese pastor, and worshiping in private. According to Ghebrehiwot, while he was in the care of Pastor Josieth and unable to return to Eritrea, legislation was enacted in Eritrea that limited the right to practice any but four officially recognized religions. In May 2002, the Eritrean government

6

ordered all houses of worship, that were not either Eritrean Orthodox, Roman Catholic, Lutheran or Islamic, to close. According to Ghebrehiwot, after that legislation was enacted, the Eritrean government systematically rounded up and tortured hundreds of members of nonsanctioned religions, including Pentecostals. He said that his Eritrean pastor was arrested, held incommunicado, and was in danger of being tortured solely because he did not observe one of the sanctioned religions.

According to Ghebrehiwot, the Eritrean government also banned adherents of all other religions from governmental positions and it also attempted to purge them from the military. He also testified about individual acts of oppression including subjecting 60 teenage Protestant soldiers to torture and imprisoning them in metal containers because they were caught carrying bibles; and threatening, beating and incarcerating 74 Pentecostal soldiers who refused to renounce their beliefs and return to the Eritrean Orthodox Church. Ghebrehiwot claimed that the Eritrean government also stepped up its campaign against political dissidents.

Ghebrehiwot testified that some of the former soldiers who retreated with him to Sudan managed to apply for asylum in Malta. However, the Maltese authorities rejected their claims and returned them to Eritrea where they were detained and held incommunicado. Although they were never formally charged, the Eritrean president publicly stated that he considered these detainees traitors and spies. That they were then tortured so badly that some were paralyzed, and others were killed.

Ghebrehiwot also explained that he feared returning to

7

Eritrea because he could have been tortured or killed. He based this fear upon what he claimed happened to others who left the Eritrean army and were subsequently returned by the Maltese government. He explained that the torture they were subjected to included detention "in a style called 'helicopter'[4] and some of them were paralyzed and . . . others . . . faced death because they left Eritrea."

Ghebrehiwot maintained his fear was justified even though he conceded that, to the best of his knowledge, his brother who is also Pentecostal, continues to live and worship in Eritrea without experiencing any repression.

Ghebrehiwot submitted news articles and country condition reports during his hearing before the IJ. Some of those reports tell of deserters who sought refugee status in other countries, including Sudan. In one article, Amnesty International quoted a former deserter who was returned from Malta as saying he had been tortured upon return to Eritrea.

## II. PROCEEDINGS BEFORE THE IJ AND THE BIA.

The Immigration Judge denied Ghebrehiwot's claim without making a credibility determination. Her decision was based upon her conclusion that the evidence Ghebrehiwot presented did not establish eligibility for any relief. The IJ

---

[4]Ghebrehiwot testified that "helicopter" consists of tying a prisoner's hands and legs behind his back and then suspending the prisoner from a tree for hours at a time.

believed that Ghebrehiwot's fear of returning to Eritrea arose from his "desertion" from the army, and prosecution for desertion does not ordinarily constitute "persecution" for immigration purposes.[5]  The IJ acknowledged that legally justified prosecution can be so severe that it rises to the level of "persecution" and an alien may therefore establish that he/she is a "refugee" if the unduly harsh treatment is based upon race, religion, nationality, or  membership in a social or political group.  Nonetheless, the IJ ruled that since Ghebrehiwot had not established that his fear of prosecution for desertion was based upon any of those protected traits, he was not entitled to any relief.

The IJ rejected Ghebrehiwot's claim of refugee status based upon religious persecution because he had never experienced problems in Eritrea related to his faith, and his brother remained in Eritrea where he continued to observe his religion without any problems.   Although the IJ noted that the background materials and reports Ghebrehiwot introduced did show some conflict between the various religious groups in Eritrea, the IJ concluded that "the background material is not supportive of the facts presented. . .." She reasoned that Ghebrehiwot was "never a target of the government" in Eritrea

---

[5] We realize that Ghebrehiwot does not concede that he deserted his army post. Rather, he maintains that he was forced to flee to Sudan by the advancing Ethiopian army and he was not able to get back across the border. The IJ found to the contrary.  However, that finding does not alter our analysis.

9

and therefore the evidence did not support a finding that his subjective fear was reasonable. *Id.*

After concluding that Ghebrehiwot was not entitled to asylum, the IJ denied withholding of removal and relief under the CAT. Her only explanation for doing so was as follows: "The Court must necessarily deny the applicant's request for withholding of removal and relief under the Convention against Torture which require a more stringent evidentiary burden [than asylum]."

The BIA affirmed without opinion, and this petition for review followed.

## III. STANDARD OF REVIEW

Where the BIA affirms the IJ's decision without opinion, we review the decision of the IJ as if it were the decision of the BIA. *Zhang v. Gonzales*, 405 F.3d 150, 155 (3d Cir. 2005). We review the IJ's denial of relief to determine if the conclusion is supported by substantial evidence. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). INA § 242(b)(4)(B) provides that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Thus, if the applicant "seeks to obtain judicial reversal of the [denial of asylum], he must show that the evidence he presented was so compelling that no reasonable fact finder could fail to find" the requisite likelihood of persecution. *Elias-Zacarias*, 502 U.S. at 483-84. "Under this standard, a finding will stand if it is supported by reasonable, substantial, and probative evidence in the record

10

when considered as a whole." *Secaida-Rosales v. INS*, 331 F.3d 297, 307 (3d Cir. 2003) (citation and internal quotations omitted). The same standard applies to the BIA's denial of Ghebrehiwot's claim for withholding of removal. To reverse the decision below, we must find that the record "not only supports that conclusion, but compels it." *Elias-Zacarias*, 502 U.S. at 481 n.1. Finally, since the IJ did not make an adverse credibility determination here, we proceed as if the alien's testimony was credible. *Kayembe v. Ashcroft*, 334 F.3d 231, 235 (3d Cir. 1003).

## IV. GENERAL LEGAL PRINCIPLES
## A. Asylum and Withholding of Removal.

The Attorney General has discretion to grant asylum to a removable alien. *See* 8 U.S.C. § 1158(a). However, that discretion can only be exercised if the alien first establishes that he/she is a "refugee." *Id.* A "refugee" is:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside of any country in which such person last habitually resided, and who is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality,

11

> membership in a particular social
> group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The asylum applicant must therefore present some evidence that removal will result in persecution "on account of" one of the five statutory grounds in order to establish eligibility for asylum.

An applicant who offers credible testimony regarding past persecution is presumed to have a well-founded fear of future persecution. *Berishaj v. Ashcroft*, 378 F.3d 314, 323 (3d Cir. 2004) (citation omitted). The "well-found fear of persecution" standard involves both a subjectively genuine fear of persecution and an objectively reasonable possibility of persecution. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987). The subjective prong requires a showing that the fear is genuine. *Mitey v. INS*, 67 F.3d 1325, 1331 (7th Cir. 1995). The objectively reasonable prong requires ascertaining whether a reasonable person in the alien's circumstances would fear persecution if returned to a given country. *Zubeda v. Ashcroft*, 333 F.3d 463, 469 (3d Cir. 2003) (citation omitted).

"To satisfy the objective prong, the asylum petitioner must show he or she would be individually singled out for persecution or that 'there is a pattern or practice in his or her country . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Sukwanputra v. Gonzales*, 434 F.3d 627, 637 (3d Cir. 2006) (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)). Although applicable regulations do not define a "pattern or practice," we have

12

explained that "the persecution of the group must be systematic, pervasive, or organized," to constitute a pattern or practice. *Id*. (citation omitted). "In addition, as with any claim of persecution, the acts must be committed by the government or forces the government is either unable or unwilling to control." *Id*. (citation omitted).

Withholding of removal is mandatory once "the Attorney General determines that [the] alien's life or freedom would be threatened" because of a protected trait or activity.[6] 8 U.S.C. § 1231(b)(3)(A). To obtain such relief, an alien must establish a "clear probability," i.e., that it is more likely than not, that he/she would suffer persecution. *See INS v. Stevic*, 467 U.S. 407, 429-30 (1984). Because this standard is higher than that governing eligibility for asylum, an alien who fails to qualify for asylum is necessarily ineligible for withholding of removal. *Zubeda*, 333 F.3d at 469-70.

## B. Relief under the Convention Against Torture.

As noted earlier, Ghebrehiwot also sought protection under Article 3 of the CAT. The CAT became binding on the United States in November of 1994 when President Clinton delivered the ratifying documents to the United Nations. U.N. Doc. 571 Leg/SER.E/13.IV.9 (1995); Convention, art. 27(2). The Foreign Affairs Reform and Restructuring Act of 1998

---

[6] An application for asylum is deemed to also constitute at the same time an application for withholding of removal. 8 C.F.R. § 1208.3(b).

13

("FARRA") implemented the CAT. Section 2242, Pub.L. No. 105-277, Div. G. 112 Stat. 2681-761 (Oct. 21, 1998) (codified at 8 U.S.C. § 1231). That legislation requires that "[n]o state . . . expel, return ('refouler') or extradite a person to another state where he would be in danger of being subjected to torture." *Id.* Accordingly, "it shall be the policy of the United States not to expel. . . or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture. . . ." *Id.*

"An applicant for relief . . . under [Article 3] of the Convention Against Torture bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Sevoian v. Ashcroft*, 290 F.3d 166, 174-175 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)). "The United States Senate specified this standard, as well as many of the other standards that govern relief under the Convention, in several 'understandings' that it imposed on the United States' ratification of the Convention Against Torture." *Id.* at 175 (citations omitted). Unlike asylum or withholding of removal, "[the CAT] has no subjective component, but instead requires the alien to establish, by objective evidence, that he is entitled to relief." *Id.* (citation and internal quotations omitted). The alien's testimony, if credible, may be sufficient to sustain the burden of proof without corroboration. *Mansour v. INS*, 230 F.3d 902, 907 (7th Cir. 2000) (citing 8 C.F.R. § 208.16(c)(2)). If an alien meets his or her burden of proof, withholding of removal or deferring of removal is mandatory. INA § 241(b)(3); 8 C.F.R. §§ 208.16 - 208.18.

14

Under the applicable implementing regulations: Torture is defined as an act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). The regulations also provide:

(3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:
(I) Evidence of past torture inflicted upon the applicant;
(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
(iv) Other relevant information regarding

15

conditions in the country of removal.

8 C.F.R. § 208.16(c)(3). In determining whether relief under the CAT is warranted, "country conditions alone can play a decisive role in granting relief . . . and the relevant statutory and regulatory language . . . does not require that the prospective risk of torture be on account of certain protected grounds." *Kamalthas v. INS*, 251 F.3d 1279, 1280 (9th Cir. 2001).

However, "[i]t is significant that even cruel and inhuman behavior by government officials may not implicate the torture regulations." *Sevoian*, 290 F.3d at 175. "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel and inhuman treatment or punishment that do not amount to torture." 8 C.F.R. § 208.16(c)(3)(I). Moreover, the BIA has held that "torture covers intentional governmental acts, not negligent acts or acts by private individuals not acting on behalf of the government." *In re J-E-*, 23 I. & N. Dec. 291, 299 (BIA 2002). Finally, "[t]orture does not include pain or suffering arising only from, inherent in, or incidental to, lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture." 8 C.F.R. § 208.18(a)(3).

## V. DISCUSSION

Ghebrehiwot makes a number of arguments in support of

16

his petition for review.  Each is discussed separately below.[7]

## A.  Ghebrehiwot's Well-Founded Fear of Persecution

"An alien may demonstrate that his/her [well-founded fear of persecution] is objectively reasonable by documentary or expert evidence about the conditions in a given country." *Lusingo v. Ashcroft*, 420 F.3d 193, 199 (3d Cir. 2005). Ghebrehiwot claims that the IJ's finding that he did not establish a well-founded fear of persecution based on his religion was error.  He argues that his documentary evidence

---

[7] At the outset of our discussion, we noted that Ghebrehiwot admitted that he had never been subjected to past persecution on account of his Pentecostal religion while in Eritrea. Indeed, the only acts of past persecution occurred while Ghebrehiwot was in Sudan.  Although Ghebrehiwot claimed that his conscription into the Eritrean military constituted persecution, the IJ correctly rejected that contention.  *See Ambartsoumian v. Ashcroft*, 388 F.3d 85, 93 (3d Cir. 2004) (citing 8 U.S.C. § 1101(a)(42)). Ghebrehiwot's conscription did not, by itself, constitute persecution.

Ghebrehiwot now amplifies that claim by arguing that, as a former member of the military, he can be considered a member of a "social group" that will be persecuted for purposes of the Immigration and Nationalities Act. Appellant's Br. at 23. (citing *Cruz-Navarro v. INS*, 232 F.3d 1024, 1029 (9th Cir. 2000). However, as we note below, the IJ never addressed this claim.

17

was itself sufficient to establish a pattern and practice of religious persecution of members of the Pentecostal religion beginning after he fled to Sudan in November, 2001.[8]

Ghebrehiwot cites the State Department's International Religious Freedom Report 2004 ("2004 Report") which noted that in September 2004, "the Secretary of State designated Eritrea as a 'Country of Particular Concern' under the International Religious Freedom Act for particularly severe violations of religious freedom." 2004 Report, at 1. The Report includes the following statement about the Eritrean government:

> The Government's poor respect for religious freedom for minority religious groups continued to decline during the period covered by this report. The Government harassed, arrested, and detained members of Pentecostal and other independent evangelical groups' and reform movements from and within the Eritrean Orthodox Church, and Jehovah's Witnesses. There were also numerous reports of physical torture and attempts at

---

[8]Ghebrehiwot also argued before the BIA that the materials he submitted to the IJ demonstrate a pattern and practice of persecution of Pentecostals. Thus, he has administratively exhausted that claim. *See* 8 U.S.C. § 1252(d)(1).

18

> forced recantations. Following a May 2002 government decree that all religious groups must register or cease all religious activities, the Government closed all religious facilities not belonging to the four sanctioned religions. These closures, the Government's refusal to authorize any registrations, and the restriction on holding religious meetings continued throughout the period covered by this report.

*Id.*

In addition to the 2004 Report, Ghebrehiwot submitted approximately thirty different articles which he contends document the Eritrean government's systematic persecution of adherents of disfavored religions, including Pentecostals. He claims that the articles recite incidents of the government's breaking up Pentecostal weddings and arresting everyone identified as a "Pente."[9] This includes locking up children in metal shipping containers for carrying Bibles, arresting hundreds of adults and children simply for being members of an evangelical or Pentecostal church, and torturing members of

---

[9]Ghebrehiwot claims that "Pente" is a derogatory name derived from "Pentecostal" and is applied to members of all of Eritrea's disfavored Evangelical churches. Ghebrehiwot's Br. at 18 n.8.

19

disfavored religious groups until they signed statements repudiating their faith. He notes that one of the articles reported that his pastor was among the detainees arrested and held incommunicado in an effort force him to abandon his faith.

In Ghebrehiwot's view, these materials establish a pattern and practice of persecution of members of the Pentecostal religion.[10] Thus, he concludes that because he has presented evidence that he is a Pentecostal and that there is a pattern and practice of persecution of Pentecostals in Eritrea, he has demonstrated a well-founded fear of future persecution.

The government argues that Ghebrehiwot's documentary evidence does not support a finding of a pattern and practice of religious persecution of Pentecostal Christians by the Eritrean government. The government also notes that Ghebrehiwot's brother is also a Pentecostal Christian, and has remained in Eritrea without experiencing religious persecution. In the government's view, this undermines Ghebrehiwot's claim. *See,*

---

[10]Ghebrehiwot notes that Eritrea's pattern and practice of religious persecution has drawn the attention of courts in the United States. He cites *Fessehaye v. Gonzales* 414 F.3d 746 (7th Cir. 2005), *Ghebremedhin v. Ashcroft*, 385 F.3d 1116 (7th Cir. 2004), and *Muhur v. Ashcroft*, 355 F.3d 958 (7th Cir. 2004). However, these cases involved persecution of Jehovah's Witnesses, not Pentecostals. The Eritrean government persecutes Jehovah's Witnesses because they do not believe in the legitimacy of any government and they refuse to serve in the military.

20

*e.g., Krasnopivtsev v. Ashcroft*, 382 F.3d 832, 839 (8th Cir. 2004) ("The reasonableness of a fear of persecution is diminished when family members remain in the native country unharmed, and the applicant himself had not been singled out for abuse.").

The government concedes that the 2004 State Department report establishes that the State Department views Eritrea as a country of concern, but it argues that the concern does not rest on religious persecution. It contends the evidence shows instances of arrests and detention of journalists, government critics, and members of non-registered religious groups, as well as registered religious groups. The documentary evidence also refers to repression of academic freedom and states that the military may be acting independently of the government. In short, the government contends that the materials establish a regime that takes repressive action against those it considers dissidents, but this does not establish a pattern and practice of religious persecution of Pentecostal Christians. In addition, the government suggests that Ghebrehiwot's evidence merely obfuscates the issue because it establishes that any religion other than the four state-approved religions, is referred to as "Pentecostal" or "Pente" by factions in the government. The government contends that discrimination on the basis of race or religion, although reprehensible, does not automatically establish "persecution." *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995).

As noted above, in rejecting Ghebrehiwot's claim, the IJ observed that there appeared to be some conflict between the various religious groups, but concluded that "the background

21

material is not supportive of the facts presented. . .” The IJ considered Ghebrehiwot's documentary evidence and his testimony and concluded that Ghebrehiwot had not demonstrated a well-founded fear of persecution.

The IJ focused on the absence of evidence of past persecution before Ghebrehiwot left Eritrea. However, the IJ failed to address the 2004 Report and the other materials Ghebrehiwot submitted that could easily demonstrate an objective basis for a well-founded fear of future religious persecution if Ghebrehiwot returns to Eritrea. This record certainly suggests a pattern and practice of persecution of Pentecostals in Eritrea after Ghebrehiwot left. Although the government attempts to minimize the import of much of this evidence by suggesting that it is not limited to Pentecostals, that rejoinder is as puzzling as it is unconvincing. The fact that Pentecostals are not singled out for persecution and that other religious minorities may also be persecuted does not negate religious persecution or a well-founded fear of future persecution based upon religion. It merely means that the Eritrean government does not restrict its persecution to Pentecostals.

Accordingly, we will remand to the BIA so that the IJ can consider whether the country condition evidence submitted by Ghebrehiwot establishes a pattern and practice of persecution of Pentecostals by the Eritrean government after Ghebrehiwot left Eritrea. *See Sukwanputra*, 434 F.3d at 637. (“Here, the IJ found that petitioner had not established a well-founded fear of persecution without specifically addressing whether a pattern or practice of persecution existed in

22

Indonesia. Accordingly, on remand, petitioners' claim that there is a pattern or practice of persecution of Chinese Christians must be considered.").

## B. Ghebrehiwot's Status as a Deserter

As noted above, the IJ found that Ghebrehiwot was a deserter and explained that, ordinarily, fear of prosecution for being a deserter does not constitute persecution.[11] Ghebrehiwot argues that, even assuming *arguendo* that he is a deserter, he nevertheless has a well-founded fear of persecution based upon his religious beliefs because he will be singled out for particularly cruel treatment merely because he does not practice one of the favored religions. He bases that argument on *Johnson v. Gonzales*, 416 F.3d 205, 212 (3d Cir. 2005). There, we explained that "an alien may be eligible for asylum even if the persecution he or she suffered, or fears suffering in the future, is only partially based on a ground enumerated in the

---

[11]"As a general matter, . . . we have held that fear of prosecution for violations of fairly administered laws does not itself qualify one as a refugee or make one eligible for withholding of removal." *Chang v. INS*, 119 F.3d 1055, 1060 (3d Cir. 1997) (citation omitted). "Thus, those who violate laws governing . . . military conscription . . . do not merit asylum based on their fear of punishment for the crime that they committed." *Id.* (citations omitted). *See also De Valle v. INS*, 901 F.2d 787, 792 (9th Cir. 1990) ("punishment received for a breach of military discipline, such as desertion, is generally not viewed as persecution").

23

[INA]." He also cites *Nuru v. Gonzales*, 404 F.3d 1207 (9th Cir. 2005). There, an Eritrean spoke out against the Eritrean-Sudanese war while in the military. That resulted in severe physical abuse amounting to torture at the hands of his commanding officers. Ultimately, he deserted and arrived in the United States where he sought asylum. On appeal, the court ruled that the fact that he could legitimately be punished as a deserter did not prevent him from establishing a well-founded fear of future persecution based on his political opinion. *Id*. at 1227-29.

However, apparently because of her focus on the absence of past persecution, the IJ here did not address this claim in this context. On remand, the BIA can consider Ghebrehiwot's evidence of country conditions after he left Eritrea, and address this claim in the context Ghebrehiwot asserts it.[12]

## C. Well-Founded Fear of Persecution on Account of Membership in a Social Group.

Ghebrehiwot also claims he is entitled to relief because

---

[12] The government agrees that if this case is remanded to the BIA, Ghebrehiwot can assert claims previously raised, but not addressed. *See* Appellee's Br. at 15 ("This would be appropriate especially with regard to two arguments not addressed by the Immigration Judge, in particular the argument of a social group based on military deserters and the argument that the written materials were sufficient to establish a pattern and practice of religious discrimination").

24

his return to Eritrea would result in his persecution by the Eritrean government based upon his membership in a particular social group. "Both courts and commentators have struggled to define 'particular social group.'" *Fatin*, 12 F.3d at 1238. It is not defined in the Immigration and Nationalities Act. However, in *Fatin*, we noted that in *Matter of Acosta*, 19 I. & N. Dec 211, 233 (BIA 1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987), the BIA had interpreted "particular social group" to refer to a "group of persons all of whom share a common, immutable characteristic." The BIA explained:

> The shared characteristic might be an innate one such as sex, color or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, . . . the common characteristic that defines the group . . . must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. Only [then] does the mere fact of group

25

membership become something comparable to the other four grounds of persecution under the Act . . ..

*Acosta*, 19 I. & N. Dec 211, at 233-34. We adopted that construction of "particular social group" in *Fatin*, holding that it was a "permissible" construction of the statute.[13] 12 F.3d at 1240. We also discussed this phrase in *Escobar v. Gonzales*, 417 F.3d 363 (3d Cir. 2005). There, after reviewing the relevant jurisprudence, we concluded:

membership in a 'particular social group' can be attributed to either: (1) those who possess immutable characteristics such as race, gender or a prior position, status or condition; or (2) those who possess

---

[13] In *Fatin*, we held that the asylum applicant's particular social group could consist of "Iranian women who [found] their country's gender-specific laws offensive and [did] not wish to comply with them," to the extent that they would suffer severe consequences for their noncompliance. 12 F.3d at 1241. The group characteristic was its members' shared beliefs. Those beliefs were so fundamental that the group should not have been required to change them. *Id*. However, we found that relief was properly denied because the applicant failed to establish a well-founded fear of persecution of the group. *Id.* at 1243.

26

> a characteristic that is capable of being changed but is of such fundamental importance that individuals should not be required to modify it, e.g., religion.

*Id*. at 367.[14]

Ghebrehiwot claims that his social group is "Eritrean soldiers that were forced to retreat into Sudan by Ethiopian forces who have been unwilling to return home after Ethiopian forces withdrew due to a well-founded fear of persecution

---

[14]In *Escobar*, we held that "homeless Honduran street children" are not a "particular social group" within the meaning of the Immigration and Nationalities Act. 417 F.3d at 364. We noted that the three main elements of the claimed social group were poverty, youth and homelessness, but that the record failed to show any differences between the Honduran street children and poor, young and homeless children in other parts of the word. *Id*. at 367. Therefore, we concluded that "a legitimate distinction cannot be made between groups of impoverished children who exist in almost every country." *Id.*

However, in *Lukwago v. Ashcroft*, 329 F.3d 157, 178-79 (3d Cir. 2003) we held that a former child soldier who escaped captivity by a guerilla group was a member of a "particular social group" because his status as a former child soldier is one cannot be changed and is fundamental to his identity.

27

based on being labeled a 'traitor' or 'spy.'"[15] Ghebrehiwot's Br. at 23. He insists that, although he is neither traitor nor spy, the Eritrean government will impute those characteristics to him and treat him accordingly. *See Johnson*, 416 F.3d at 211 (noting that asylum relief is available based on imputed grounds). He bolsters that claim by refering to the fate of those Eritrean soldiers who were in Sudan with him and who were involuntarily repatriated to Eritrea by the Maltese government. As noted earlier, Ghebrehiwot claims they were tortured and physically abused by the Eritrean government to the extent that some are now paralyzed and others have died.

However, Ghebrehiwot never made this social group argument to the IJ. Although the did make that argument to the BIA, the BIA merely affirmed the decision of the IJ without opinion, and never ruled upon the social group claim. Accordingly, that claim is not properly before us, but Ghebrehiwot can reassert it on remand to the BIA.[16]

## D. Disproportionate Punishment.

Ghebrehiwot further argues that even if he is a deserter and he does not have a well-founded fear of persecution based on his religious beliefs alone, or as a member of a social group,

---

[15] As noted earlier, Ghebrehiwot claims that the Eritrean government considers people in Ghebrehiwot's situation to be traitors and spies.

[16] *See* note 12, *supra*.

28

he is nonetheless entitled to asylum because the punishment he will face as a deserter will be disproportionately greater because he is a Pentecostal. He relies in part on *Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1120 (7th Cir. 2004). There, the court said: "When a country subjects a draft evader to more serious punishment than others who have also evaded service because of his race, religion, nationality, social group or political opinion, this amounts to persecution rather than simple nationalism." However, this argument obfuscates a more fundamental issue. If, as Ghebrehiwot contends, he has a well-founded fear of persecution on account of his religious beliefs alone, little is added if he establishes that he will receive disparate punishment for desertion because of his religious beliefs. Ghebrehiwot appears to be arguing that any prosecution he might receive for being a deserter would be applied with far more vigor and/or vindictiveness because he is also a member of a religion that is not sanctioned. This claim is also best addressed on remand in the context of the evidence of changed country conditions after he left Eritrea.[17]

## E.  Denial of CAT Claim.

We have already explained that the IJ denied Ghebrehiwot's claim for CAT relief with no analysis. She merely stated: "The Court must necessarily deny the applicant's request for withholding of removal and relief under the Convention against Torture which require a more stringent evidentiary burden." App. 41. We can only assume from this

---

[17] *See* note 12, *supra*.

29

explanation that the IJ believed that if an alien did not prevail on his/her asylum claim, any claim for relief under the CAT must also fail. However, we have previously explained that denial of a claim for withholding of removal or asylum "does not control the analysis of [a] claim for relief under the Convention Against Torture." *Zubeda*, 333 F.3d at 476. "[A] claim under the Convention is not merely a subset of claims for either asylum or withholding of removal." *Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir. 2001). Claims for CAT relief and claims for asylum and withholding of removal are "analytically distinct."

> [A]sylum and withholding of [removal] require that the alien be both a "refugee," and establish either a well founded fear, or probability of persecution, "on account of" at least one of the five specified grounds. The Convention Against Torture is not limited to "refugees," nor does persecution have to be "on account of" political opinion, religious or social group, etc. Rather, the Convention simply seeks to prevent any country from having to return someone to a place where it is likely he/she will be tortured.

*Zubeda*, 333 F.3d at 476.

We cannot adjudicate Ghebrehiwot's claim for CAT

30

relief in the first instance because our role is limited to determining if there is substantial evidence to support the IJ's determinations.  Since the IJ committed legal error in holding that failure to meet the evidentiary burden for asylum precluded relief under the CAT, we will grant the petition for review and remand to the BIA for a determination of Ghebrehiwot's CAT claim in the first instance.  *See Berishaj*, 378 F.3d at 332 (commenting that an IJ's finding "that a CAT claim could not stand if the asylum claim fell" would be legal error and grounds for granting the petition for review).

Because we are remanding, we take care to note that the mere fact that Ghebrehiwot may be punished as a deserter does not necessarily mean that he cannot also establish that he is eligible for protection under the CAT, if the record evidence demonstrates that he will be subjected to torture by the Eritrean government. The Attorney General's implementing regulations exclude "pain or suffering arising only from, inherent in or incidental to lawful sanctions" from the definition of torture. 8 C.F.R. § 208.18(a)(3).  As we explained above, the regulation defines "lawful sanctions" as "judicially imposed sanctions and other enforcement actions authorized by law, . . ." but only so long as those sanctions do not "defeat the object and purpose of the [CAT] to prohibit torture."  *Id.*  Consequently, "[a] government cannot exempt torturous acts from CAT's prohibition merely by authorizing them as permissible forms of punishment in its domestic law." *Nuru*, 404 F.3d at 1221. "It would totally eviscerate the CAT to hold that once someone is accused of a crime, it is a legal impossibility for any abuse on that person to constitute torture." *Khouzam v. Ashcroft*, 361 F.3d 161, 169 (2d Cir. 2004).  Therefore, "while the

31

punishment of . . . military deserters . . . is certainly within a country's sovereignty, torture cannot be 'inherent in or incidental to lawful sanction' and is *never* a lawful means of punishment." *Nuru*, 404 F.3d at 1221-22 (emphasis in original).

## VI. CONCLUSION

For all of the above reasons, we will grant the petition for review and remand to the BIA for further proceedings consistent with this opinion.