**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-2966
_____

AMBROSIUS CHANDRA;
SYARIFAH AFNILLAWATY,
Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,
Respondent
_____

PETITION FOR REVIEW OF A FINAL ORDER
OF THE BOARD OF IMMIGRATION APPEALS
(Agency Nos. A95-864-509 and A95-864-510)
Immigration Judge:  Honorable Rosalind K. Malloy
_____

Submitted Under Third Circuit LAR 34.1(a)
April 28, 2011
_____

Before: BARRY, HARDIMAN and TASHIMA,[*] Circuit Judges

(Opinion Filed: May 3, 2011)
_____

OPINION
_____

_____

[*] Honorable A. Wallace Tashima, Senior Judge of the United States Court of Appeals
for the Ninth Circuit, sitting by designation.

BARRY, Circuit Judge

Ambrosius Chandra and Syarifah Afnillawaty, a married couple, petition for review of an order of the Board of Immigration Appeals ("BIA") dismissing their appeal and affirming the decision of the Immigration Judge ("IJ") denying their applications for asylum, withholding of removal, and protection from removal under the Convention Against Torture ("CAT"). For the reasons stated below, we will deny the petition.

I.

Petitioners are native citizens of Indonesia. Chandra is of Chinese descent and is a practicing Catholic. His wife, Afnillawaty, is of Indonesian descent and was raised in the Muslim faith, though she converted to Catholicism after her arrival in the United States. At the time they lived in Indonesia, the couple's religious and ethnic differences caused them great difficulties with Afnillawaty's family.[1] Additionally, Chandra was attacked by ethnic Indonesians due, he claims, to his Chinese ethnicity. Petitioners describe four main instances of physical attacks or threats.

In the first instance, in 1989, Indonesian police detained Chandra after he protested against the president and human rights violations. Chandra stated that he was detained for a day and that police threatened to kill him if he continued to protest. Government officials contacted his parents and asked them to prevent Chandra from protesting. As a

---

[1] Chandra and Afnillawaty testified at a removal hearing, and the IJ found credible the couple's statements about the problems they encountered with Afnillawaty's family. *See* A.R. at 72. We see no reason to disagree with the IJ's credibility determination. *See Lin-Zheng v. Att'y Gen.*, 557 F.3d 147, 155 (3d Cir. 2009).

result, Chandra's parents stopped supporting his education, and he had to return home to live with them.

The second instance occurred in May 1998, during a period of race riots in Indonesia, when Chandra became trapped on the second floor of an office building that was surrounded by rioters. Chandra escaped from the building into a friend's car, but rioters stopped the car because they were preventing anyone with "light skin"—which Chandra described as typical of ethnic Chinese—from passing through. A.R. at 145. The rioters smashed the car's windshield, flipped over the car with Chandra inside, and poured kerosene on the car with the intent of burning it. Chandra was able to escape from the car, but was hit with a crowbar and injured. He eventually escaped with the help of ethnic Indonesians who were in the car with him.

The third and fourth instances involved Afnillawaty's family. Chandra's first violent encounter with her family occurred when the family confronted the couple as they were returning from the movies, and he was beaten by Afnillawaty's brother and others. During this beating, Chinese slurs were shouted at him and he was called an "infidel." *Id.* at 136, 349. In July 1999, Chandra was again attacked. Five men, one with a gun, forced him into a car, blindfolded him, tied his hands, and took him to a room in a hotel where they beat him and questioned him about his ethnicity and his relationship with Afnillawaty. They also repeatedly dunked his head in a bathtub full of water until he passed out. The next day, the hotel housekeeper found Chandra on the floor and called

3

the police. Chandra stated that the police beat him in the hotel room and then took him to the precinct and accused him of kidnapping Afnillawaty. He eventually contacted Afnillawaty, and she told the police that it was Chandra who had been kidnapped. The police allowed Chandra to leave but did not investigate his abduction and beating. Chandra required medical attention for his nose and ear.

Petitioners wed in September 1999 without Afnillawaty's family's permission. The couple moved between Chandra's relatives in order to avoid Afnillawaty's family. In December 1999, the couple planned to move to New Guinea. Chandra traveled first to make living arrangements, but arrived during an independence movement and was detained for two days before being permitted to return to Indonesia. Shortly thereafter, Petitioners left Indonesia and came to the United States on non-immigrant visitor visas on February 23, 2001. They had a child later that year and were expecting a second in June 2006, a few months after the removal hearing in this case. Afnillawaty testified that she had not communicated with her family since 1999 and did not believe that they knew she was in the United States. She also testified that she was afraid to return to Indonesia because of her family and her fear that they would kidnap her child.

On August 28, 2002, more than a year after arriving in the United States, Chandra filed an application for asylum, and on December 9, 2002, Afnillawaty did the same. On November 25, 2002, the former Immigration and Naturalization Service—now the Department of Homeland Security ("DHS")—commenced removal proceedings.

4

Petitioners appeared on January 7, 2003 and conceded removability. They sought asylum, withholding of removal, and protection from removal to Indonesia under CAT.

On March 27, 2006, the IJ orally denied Petitioners' applications and granted them voluntary departure on or before May 26, 2006, in lieu of removal to Indonesia. Petitioners appealed, and the BIA affirmed the IJ's decision in a one-paragraph decision. In addition, the BIA noted that Petitioners failed to appeal the IJ's determination that they were time-barred from applying for asylum because they failed to file for asylum within one year of arrival in the United States. *See* 8 U.S.C. § 1158(a)(2)(B). Petitioners timely appealed to this Court on June 29, 2007.

## II.

We have jurisdiction under 8 U.S.C. § 1252(a)(1) to review final orders of removal. Where, as here, the BIA affirms the IJ and adopts the IJ's opinion, "a reviewing court must, as a matter of logic, review the IJ's decision to assess whether the BIA's decision to defer was appropriate." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.2 (3d Cir. 2001).

A party applying for withholding of removal must demonstrate by a "clear probability" that, "upon return to his or her home country, his or her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." *Chen v. Ashcroft*, 376 F.3d 215, 223 (3d Cir. 2004) (citations and internal quotation marks omitted); *see also* 8 U.S.C. § 1231(b)(3). The

"clear probability" standard is more stringent than the standard for granting asylum, which requires a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Accordingly, "[a]n alien who fails to establish that he or she has a well-founded fear of persecution, so as to be eligible for a grant of asylum, necessarily will fail to establish the right to withholding of removal." *Chen*, 376 F.3d at 223. Applicants for asylum must present some evidence "that removal will result in persecution 'on account of' one of the five statutory grounds." *Ghebrehiwot v. Att'y Gen.*, 467 F.3d 344, 351 (3d Cir. 2006). An applicant who establishes past persecution is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 1208.16(b)(1)(i).

We will uphold the determinations of the IJ and BIA "if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). We will reverse "only if the evidence presented . . . was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.*

The IJ heard Petitioners' testimony about their fear of persecution and concluded that the "major problems" involved Afnillawaty's family's objection to an interfaith, interethnic marriage. A.R. at 72. Because these "problems" stemmed from familial issues and not from government agencies or actors, the IJ found that the "situation does not rise to the level of persecution." *Id.* at 74. With respect to the allegations regarding

6

the 1998 attack on Chandra, the IJ found that it too did not constitute persecution because the country was in "total chaos" and "civil strife." *Id.* As for his 1989 confinement at the hands of the police after protesting against the government, the IJ found that this did not relate in any way to Chandra's faith or ethnicity.

Past persecution requires proof of "(1) one or more incidents rising to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed either by the government or by forces that the government is either unable or unwilling to control." *Mulanga v. Ashcroft*, 349 F.3d 123, 132 (3d Cir. 2003). We have held that "'persecution' is an extreme concept that does not include every sort of treatment our society regards as offensive." *Fatin v. INS*, 12 F.3d 1233, 1243 (3d Cir. 1993).

It is clear that the physical attacks and abuse discussed above were because of Afnillawaty's family, not government actors, and there is little or no evidence to support Petitioners' contention that the government was "unable or unwilling" to control the religious and ethnic biases of her family. *Mulanga*, 349 F.3d at 132. While, to be sure, the police failed to investigate the circumstances surrounding Chandra's abduction and beating, there is no evidence that Chandra or Afnillawaty ever attempted to enlist Indonesian authorities to prevent further attacks or threats by her family. Additionally, the 1998 attacks on Chandra during a period of general civil strife do not constitute grounds for asylum. *See Konan v. Att'y Gen.*, 432 F.3d 497, 506 (3d Cir. 2005) ("Mere

7

generalized lawlessness and violence between diverse populations, of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world, generally is not sufficient to permit the Attorney General to grant asylum." (citation and internal quotation marks omitted)).  In sum, Petitioners did not establish past persecution committed by the Indonesian government or forces that the government was unable or unwilling to control.[2]

Nor did Petitioners establish a well-founded fear of future persecution.  "To establish a well-founded fear of future persecution an applicant must first demonstrate a subjective fear of persecution through credible testimony that her fear is genuine." *Lie v. Ashcroft*, 396 F.3d 530, 536 (3d Cir. 2005).  Second, the applicant must show, objectively, that a reasonable person in the applicant's position would fear persecution upon return to the country.  *Id.*  To satisfy the objective prong, the applicant must show that "she would be individually singled out for persecution or demonstrate that 'there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Id.*  (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)).

---

[2] The single instance of a direct government threat—the threat that occurred during Chandra's 1989 detention—does not rise to the level of persecution because the threat was not "highly imminent or concrete." *Chavarria v. Gonzalez*, 446 F.3d 508, 518 (3d Cir. 2006) ("[W]e have refused to extend asylum protection for threats that, while sinister and credible in nature, were not highly imminent or concrete or failed to result in any physical violence or harm to the alien.").

8

To constitute a "pattern or practice," the persecution of a group or individual must be "systemic, pervasive, or organized." *Wong v. Att'y Gen.*, 539 F.3d 225, 233 (3d Cir. 2008) (quoting *Lie*, 396 F.3d at 537). Additionally, "as with any claim of persecution, violence or other harm perpetrated by civilians against the petitioner's group does not constitute persecution unless such acts are committed by the government or forces the government is either unable or unwilling to control." *Lie*, 396 F.3d at 537 (citation and internal quotation marks omitted). Petitioners argue that the IJ ignored information within U.S. Department of State Country Reports showing that the Indonesian government supports the persecution of Chinese Indonesians through discriminatory laws and practices. We have rejected similar claims based on Country Reports on Indonesian violence against ethnic Chinese. *See*, *e.g.*, *Wong*, 539 F.3d at 234-35. Here, although the IJ did not fully discuss why Petitioners could not establish a pattern or practice of persecution against them in Indonesia, *see* A.R. at 75, it is clear from the record that the harms they expect to suffer would be because of Afnillawaty's family, and not government forces or entities that the government is unwilling or unable to control.

Finally, as to Petitioners' claim under CAT, we do not have jurisdiction to review the denial of CAT protection because Petitioners failed to exhaust this claim at the administrative level. *Abdulrahman v. Ashcroft*, 330 F.3d 587, 594-95 (3d Cir. 2003). But Petitioners would not prevail even if we had jurisdiction. Petitioners must establish "that it is more likely than not that [they] would be tortured if removed to the proposed country

9

of removal."  8 C.F.R. § 208.16(c)(2); *see also Sevoian v. Ashcroft*, 290 F.3d 166, 174-75

(3d Cir. 2002).  Torture is defined as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).  Accordingly, to qualify as "torture" under CAT, the torture must

occur "with the consent or acquiescence of the government."  *Gomez-Zuluaga v. Att'y*

*Gen.*, 527 F.3d 330, 349 (3d Cir. 2008).

As already discussed, the IJ correctly found that Petitioners' troubles stemmed

from the Afnillawaty family, not from the government of Indonesia, either directly or

indirectly.  Petitioners cannot establish that it is more likely than not that the government

of Indonesia will instigate, consent, or acquiesce in torturing them upon return.

### III.

Because the determinations of the IJ and BIA are "supported by reasonable,

substantial, and probative evidence on the record considered as a whole," *Elias-Zacarias*,

502 U.S. at 481 (citation omitted), we will deny the petition for review.