**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4642
_____

ALI ABAZAJ,

                              Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A088-366-138)
Immigration Judge:  Honorable Frederic Leeds

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
August 17, 2011
Before:  SMITH, WEIS and GARTH, Circuit Judges

(Opinion filed: September 1, 2011)
_____

OPINION
_____

PER CURIAM

        Ali Abazaj petitions for review of a Board of Immigration Appeals (BIA) decision

dismissing his appeal.  For the following reasons, we will deny the petition for review.

                                        I.

        Abazaj, an ethnic Albanian and Muslim who describes himself as "a native of the

former Yugoslavia," entered the United States without inspection in May of 2007, and was placed into expedited removal proceedings. Abazaj did not contest his removability. Soon thereafter, he applied for asylum, withholding of removal, and protection under the United Nations' Convention Against Torture (CAT), and was found to have a credible fear of persecution.

In his I-589 application and his appearance before the Immigration Judge (IJ), Abazaj explained the story behind his departure from Kosovo. He claimed that in the late 1980s, his family became supportive of the Democratic League of Kosovo (LDK), a "moderate" political entity that, according to Abazaj, was and is disliked by the more extreme elements in the country. Administrative Record ("A.") 526. Abazaj officially joined the party in 2002, when it became legal to do so, and his neighbors "all knew" of his family's LDK affiliation. A.526, 528. Also around this time, Abazaj became involved with a construction company, and in the course of his business began to rebuild the homes of Serbs and Roma that had been destroyed during the Kosovo War. He started to receive threatening, anonymous telephone calls, assailing him for rebuilding the houses of those who did not "deserve to be living in Kosovo." A.156. These calls often came daily. In June 2005, Abazaj was approached by three men at a construction site; after issuing threats, they beat him up. A.159. Abazaj declined to see a doctor or go to the police, based on his conviction that the police would not offer him any help due to divided loyalties; in his words, "had I reported the case to the police I felt like I would have more problems." A.160. Following this incident, Abazaj halted construction on the houses, although the threatening phone calls apparently continued for at least a short

2

while.  A.161.

Then, in Spring 2006, Abazaj started his own construction business, procuring merchandise and building materials from Serbia.  The threatening phone calls began again, the perpetrators attacking Abazaj for acquiring Serbian materials when there were "products from [Kosovo]" he could be buying instead.  The anonymous callers demanded €70,000 in compensation.  A.163.  In August, a group of men came to the store and administered another beating, while making "direct threats against [him] or [his] family." A.164.  The men also insisted that Abazaj "join them."  A.165.  Again, Abazaj declined to go to the police.  A.165.  He believed that his attackers were from the Albanian National Army (AKSh), a right-wing, anti-Serbian group, although he did not have any affirmative evidence of this affiliation.  See A.166–67 (basing his belief on "some killings and some explosions that they would take responsibility for, that's what made us believe that it was them and there couldn't be anybody else").  Abazaj departed Kosovo on April 24, 2007, planning to enter the U.S. illegally and migrate to Detroit, Michigan, where he would "reside and seek employment."  A.546.

In an oral opinion, the IJ found Abazaj to have been "candid" and termed his situation "sympathetic," A.61–62, but nonetheless denied the application for asylum and related relief.  He determined that there was little evidence to suggest an imputed political motive underlying the assaults.  For example, "nowhere did [Abazaj] mention that he was specifically being targeted because he [was] a member of the democratic league."  Id.  The IJ further found that Abazaj's concerns regarding the police were not supported by either the country reports or the evidence presented, and there was thus insufficient

3

evidence to sustain a finding that the government was unable or unwilling to protect him. A.64, 66. Throughout, the IJ emphasized his view that this was "not a political case" of violence. See, e.g., A.66. Thus, Abazaj had not "met [his] burden of proof" of showing either past persecution, A.67, or a well-founded fear of future persecution, A.76. As Abazaj had not satisfied the asylum standard, he was not able to meet the higher standard for withholding of removal; lastly, he had demonstrated no entitlement to relief under the CAT. A.77–78.

The BIA dismissed Abazaj's appeal, "agree[ing] with the Immigration Judge that [he] ha[d] failed to meet his burden of proof for asylum." A.3. Abazaj had failed to show that he engaged in the work of rebuilding homes for political reasons, "or that his attackers cared about his political opinions." A.3–4. Even if the attackers were motivated by their *own* political beliefs, Abazaj's political beliefs were not a "central reason" for the attacks. A.4. The BIA separately concluded that the mistreatment, regardless of its motivation, did not amount to persecution, A.4, and that Abazaj had failed to independently state a well-founded fear of future persecution—the IJ's finding on the latter ground was not "clearly erroneous." A.4. Therefore, it denied asylum, withholding, and CAT relief, dismissing the appeal. A.4–5. This petition for review followed.

## II.

We have jurisdiction over final orders of the BIA under 8 U.S.C. § 1252. While we ordinarily review decisions of the BIA and not those of the IJ, we have jurisdiction to

4

review the IJ's opinion when the BIA has substantially relied upon it. Camara v. Att'y Gen., 580 F.3d 196, 201 (3d Cir. 2009). The BIA's factual determinations, including its findings regarding past or future persecution, are reviewed for substantial evidence. See Chavarria v. Gonzalez, 446 F.3d 508, 515 (3d Cir. 2006). Under this deferential standard of review, we must uphold those outcomes "unless the evidence not only supports a contrary conclusion, but compels it." Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir. 2001); see also 8 U.S.C. § 1252(b)(4)(B).

To obtain asylum, an alien must show that he is unable or unwilling to return to the country in question by proving he suffered past persecution or has a well-founded fear of future persecution based on one of five enumerated grounds. See 8 U.S.C. § 1101(a)(42)(A) (defining "refugee" as one who suffers persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion); see also Huang v. Att'y Gen., 620 F.3d 372, 380–81 (3d Cir. 2010). A showing of past persecution creates a presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). Asylum is discretionary relief. Dong v. Att'y Gen., 638 F.3d 223, 228 (3d Cir. 2011). By contrast, withholding of removal relief is mandatory if its standard is met, but it requires the petitioner to show a "clear probability" that he would suffer persecution if repatriated—a more exacting test. Id. (citing 8 C.F.R. § 208.16(b)(1); INS v. Stevic, 467 U.S. 407, 429–30 (1984)). "Because this standard is higher than that governing eligibility for asylum, an alien who fails to qualify for asylum is necessarily ineligible for withholding of removal." Ghebrehiwot v. Att'y Gen., 467 F.3d 344, 351 (3d Cir. 2006). In order to qualify for protection under the CAT, a petitioner must show

5

that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2); see also Dong, 638 F.3d at 228–29.

As Abazaj commenced his petition for asylum after the May 22, 2005, effective date of the REAL ID Act, the provisions of that law apply to his case. Cf. Kaita v. Att'y Gen., 522 F.3d 288, 296 (3d Cir. 2008). Under the Act, the old standard, which required that persecution be motivated "at least in part" by the petitioner's political opinion, was superseded by language requiring that the petitioner "establish that . . . political opinion was or will be at least one *central* reason" for the persecution he faced or expects to face, and relief may not be granted if his political opinion is merely a "incidental, tangential, or superficial" motivating factor. 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added); Li v. Att'y Gen., 633 F.3d 136, 142 n.4 (3d Cir. 2011).

### III.

Abazaj argues that "he was threatened, attacked, and otherwise harmed by Albanian extremists, based on their perception that he was supporting the Serbians by rebuilding Serbian homes and selling Serbian supplies"; by his reasoning, this is the "very definition" of an imputed political opinion. Br. Of Pet. 15; see also Br. Of Pet. 24 ("[T]he record established that the persecutors perceived Mr. Abazaj as support[ing] the Serbs by selling Serbian materials and help[ing] to build houses for Serbs who had their homes destroyed and harmed him on account of that perception.") (internal citations, quotations, modifications omitted). Therefore, he urges, the BIA erred in determining that he had not established past persecution, which would lead to his being afforded the presumption of future persecution.

6

We do not agree with his reasoning. The record contains no evidence showing that his attackers were aware of his political affiliation with the LDK, nor—outside of an isolated mention of an exhortation to "join us"—were the attacks accompanied by aspects of political coercion. As Abazaj observes, it is undeniable that the attackers harbored anti-Serbian sentiment, warning him that Serbians did not deserve to live in Kosovo, A.526, and objected to his purchasing of Serbian building materials,[1] A.164. But the imputed political opinion that matters is Abazaj's, not his attackers'. INS v. Elias-Zacarias, 502 U.S. 478, 482 (1992) ("The ordinary meaning of the phrase 'persecution on account of . . . political opinion' in § 101(a)(42) is persecution on account of the victim's political opinion, not the persecutor's."). And there is no record evidence that would compel the conclusion that a *central reason* for the attack was Abazaj's political opinion, as opposed to the attackers' economic protectionism, a desire to extort, or plain, reprehensible thuggery—a situation complicated by Abazaj's inability to definitively identify his attackers. The interpretation embraced by the BIA—that Abazaj's political opinion, to the extent that it was a factor in the attacks, was an "incidental, tangential, or superficial" factor, see Ndayshimiye v. Att'y Gen., 557 F.3d 124, 130 (3d Cir. 2009)— finds substantial support in the record. Abazaj marshals, and quite persuasively, evidence that *suggests* the imputation of a political belief, allowing for a plausible, alternative outcome. But:

> "All of this, however, adds up to no more than that the BIA might have
> drawn an inference that the petitioner was singled out due to [his] imputed

---

[1] In his brief before the BIA, Abazaj referred to his non-political reason for purchasing these Serbian materials: they were "better made and cheaper." A.8.

7

political opinion or family ties. But the BIA chose not to draw that inference and chose instead to draw a contrary but plausible inference: that the threats were sparked by [alternative intentions]. Where the record supports plausible but conflicting inferences in an immigration case, the . . . choice between those inferences is, a fortiori, supported by substantial evidence."

De Hincapie v. Gonzales, 494 F.3d 213, 219 (1st Cir. 2007).[2]

In the alternative, Abazaj argues that he is entitled to asylum due to a well-founded fear of future persecution, as his wife continues to receive threats and armed members of anti-Serbian forces patrol the streets of Kosovo.[3] We find that substantial evidence supports the BIA's and IJ's conclusion that Abazaj failed to meet his burden of showing the required objective fear of future persecution. See Leon-Ochoa v. Att'y Gen., 622 F.3d 341 (3d Cir. 2010). He has offered nothing more than his own speculation that the police are unwilling to help him, based on an assumption that the officers' ranks are composed of former fighters of the Kosovo Liberation army, see A.189; and while the AKSh (the organization to which he believes his attackers belonged, although the record is spare on proof of this assumption) may still be active, it is unclear whether its influence has changed in the period since Abazaj's departure.

---

[2] We separately observe that Abazaj would have difficulty showing that the treatment he received, inclusive of threats directed towards his family, constituted persecution under governing case law. See Chavarria, 446 F.3d at 518 (discussing the standard for persecution).

[3] Abazaj appears to raise these arguments primarily in the context of whether the Government has successfully "rebutted" a presumption of future persecution. But since the BIA did not err in finding no past persecution, Abazaj is not entitled to such a presumption. For the sake of completeness, we decline to find the matter waived, despite Abazaj's cursory discussion of the "independent" future-persecution standard. See Br. of Pet. 37; see also Lie v. Ashcroft, 396 F.3d 530, 532 n.1 (3d Cir. 2005).

8

As Abazaj has failed to meet the standard for asylum relief, he is also not entitled to withholding of removal. To the extent that Abazaj properly raised the CAT claim in his brief before this Court, we agree with the BIA that he "has not presented evidence establishing that it is more likely than not that he will be tortured upon returning to Kosovo." A.5.

## IV.

Abazaj gave compelling testimony about the troubles he faced in Kosovo, and has advocated well for his cause both before the BIA and before this Court. That the attacks on him were motivated by an imputed political opinion based on anti-Serbian animus is not an implausible tale. But we find that the BIA's conclusion to the contrary was based on substantial evidence; as we are not *compelled* to find fault in its reasoning and basis of factual support, our deferential standard of review mandates that we leave the administrative decision undisturbed. For this reason, we will deny the petition for review.