# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2493

_____

Fnu Surya,                                    *
                                              *
            Petitioner,                       *
                                              *  Petition for Review of an Order
      v.                                      *  of the Board of Immigration Appeals.
                                              *
                                              *
Alberto Gonzales, Attorney General            *
of the United States of America,              *
                                              *
            Respondent.                       *

_____

Submitted: April 20, 2006
Filed: July 21, 2006

_____

Before MURPHY, MELLOY, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Fnu Surya, a native and citizen of Indonesia, entered the United States in 2000. He was charged with being removable for overstaying his visa. He conceded the charge and applied for asylum, claiming he suffered persecution from the Dayak people of Indonesia because he is Madurese. The immigration judge ("IJ") denied his request, finding that he failed to file for asylum within one year after arriving in this country and that he did not meet his burden of establishing eligibility for withholding of removal and protection under Convention Against Torture. The IJ noted that the

threat of persecution for Surya did not exist throughout Indonesia. He was granted voluntary departure. Surya appealed that decision to the Board of Immigration Appeals ("BIA"), which affirmed the IJ's decision. Surya now petitions this court for review. We deny the petition.

Surya was born in Sabang, Indonesia, on the island of Sumatra. He is Madurese and Muslim. As part of the Indonesian government's transmigration program, his family moved to Sampit, Kalimantan, when he was young. As of 2002, Madurese settlers like Surya's family make up roughly eight percent of Kalimantan's population, while the indigenous Dayaks comprise roughly forty percent of Kalimantan's population.

From September 5, 1994, to July 17, 1995, Surya traveled to Spain as a fisherman. To make sure that he always returned to the ship, the ship captain kept his passport when he entered the country. From April 5, 1996, to February 2, 1997, Surya was again in Spain. He then returned to Indonesia and began working in a gold factory that was owned by Dayaks. Surya testified that his problems with Dayaks began at this time. He testified that he was given heavy work with no breaks and that in 1998 he was attacked by about five members of his supervisor's crew. He stated that in a series of attacks Dayaks tried to torture him and threatened to kill him with a knife. In November or December 1998, he quit working at the factory because he feared for his life.

After leaving the gold factory, Surya returned to working as a fisherman for a Spanish company that had an office in Jakarta. From January 25, 1999, to March 11 2000, Surya traveled to Hawaii. He did not seek asylum at that time because nothing had yet happened to his family. The ship captain again kept Surya's passport for insurance, and he was not paid until after the job was done. In March 2000, Surya returned to Indonesia to collect his salary. At that time he planned to return to

Kalimantan. Also, in 1995, 1997, and 2000, Surya lived temporarily in Jakarta, Indonesia.

Upon his return to Indonesia, he contacted his sister, Prihatin, who lived in Kalimantan. She told him stories of Dayaks harming the Madurese, including the torture of his older brother. In February 2000, Surya's family's house was burned down and their possessions destroyed. Surya testified that approximately 200,000 Madurese had their houses destroyed by Dayaks at that time. The government's efforts to assist the Madurese in Kalimantan were largely unsuccessful. Surya's sisters were safe because they are married to Dayak men. As a result, his family stayed in Banjarmasin with his sister for five to six months. After that time, Surya's parents, younger sister, and older brother moved to Singapore, where they have temporary status.

Surya's last entry into the United States was on May 13, 2000. He arrived in Seattle, Washington, then took a plane to Dallas, Texas, and ended up in Florida working on a cruise ship. At the end of 2000, Surya left Florida and went to Minnesota for a job.

Surya did not file an application for asylum and withholding of removal until February 24, 2003. On April 11, 2003, INS charged Surya with being subject to removal pursuant to 8 U.S.C. § 1227(a)(1)(A). Surya testified that he did not apply immediately upon entering the country because he did not know how to apply for asylum and because he did not apply until after he received a letter from his father stating that he should not go back to Kalimantan because of killings there.

At a preliminary hearing on January 16, 2004, Surya conceded that he was subject to removal but declined to designate a country of removal. The IJ designated Indonesia. On July 1, 2004, the IJ held an evidentiary hearing. On July 20, 2004, the IJ denied Surya's application for asylum, withholding of removal, and relief under the

Convention Against Torture, but granted Surya the privilege of voluntarily departing the United States. The IJ found that Surya's application was untimely because it was not filed within one year after his arrival and he did not qualify for any exceptions to the one-year rule. The IJ also found that Surya failed to show that he would suffer future persecution based on his ethnicity if he returned to Indonesia. In particular, the IJ noted that Surya had traveled to other areas of Indonesia without incident and that the 2003 Country Report on Human Rights Practices for Indonesia noted that although relations between the Madurese and Dayaks are poor, there were no reports of killings between the groups during 2002. Further, Surya did not show that the government of Indonesia was unwilling or unable to control the problems between Dayaks and the Madurese. Lastly, the IJ concluded that Surya failed to show that it was "more likely than not" that he would be tortured by the government or someone acting on behalf of the government. Thus, he was not entitled to relief under CAT.

On July 30, 2004, Surya timely appealed the IJ's decision to the BIA. On May 10, 2005, the BIA adopted and affirmed the IJ's decision. Surya filed a petition for review of the BIA's decision on June 1, 2005.

On appeal, Surya argues that the IJ erred in finding his asylum claim was barred by the one-year limitation. An application for asylum must be filed within one year of an alien's entry into the United States. 8 U.S.C. § 1158(a)(2)(B). Surya concedes on appeal that he filed his application well after the one-year period had expired and that he did not show that he qualified for an exception to the statutory deadline. Accordingly, under our case law this court lacks jurisdiction to review the IJ's determination that the asylum application was not timely filed. Wijono v. Gonzales, 439 F.3d 868, 871 (8th Cir. 2006).

However, even if Surya's asylum claim was timely, his petition fails because he has not demonstrated that he had a well-founded fear of future persecution. Surya argues that the IJ erred in finding that he failed to show that he had a well-founded

-4-

fear of future persecution, and thus erred in denying him withholding of removal under 8 U.S.C. § 1231(b)(3). "A well-founded fear is one that is both subjectively genuine and objectively reasonable." Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997). "Subjectively, the alien must demonstrate with credible evidence that he genuinely fears persecution; objectively, he must demonstrate through credible, direct, and specific evidence that a reasonable person in his position would fear persecution." Id. We review the IJ's factual findings under the substantial evidence standard and affirm unless the record evidence is "so compelling that no reasonable factfinder" could fail to find for Surya. Ibrahim v. Gonzales, 434 F.3d 1074, 1078 (8th Cir. 2006). To prove that he is eligible for withholding of removal, Surya must demonstrate that "there is a clear probability that he would suffer future persecution, in the country to which [he] will be removed, because of [his] race, religion, nationality, membership in a particular social group, or political opinion." Ngure v. Ashcroft, 367 F.3d 975, 989 (8th Cir. 2004).

Assuming that Surya's fear of returning to Indonesia is subjectively genuine, he has not has not met his burden to demonstrate that there is a "clear probability" that he would suffer future persecution. Id. Surya principally bases his claim of future persecution on past events regarding his family, in particular the attack on his brother. "[A]ttacks on family members, absent a pattern of persecution tied to the applicant, do not establish a well-founded fear of persecution; nor do isolated acts of violence." Feleke, 118 F.3d at 598. Substantial evidence supports the IJ's conclusion that Surya has not established any such pattern of persecution. In fact, the 2003 Country Report on Human Rights Practices for Indonesia indicates that although relations between the Madurese and Dayaks remain poor, there were no reports of killings during 2002, and Surya's sisters live unharmed with Dayak men.

Further, Surya has not demonstrated that he could not move to another part of Indonesia to avoid any perceived threats of persecution. 8 C.F.R. § 1208.13(b)(3)(i) ("In cases in which the applicant has not established past persecution, the applicant

shall bear the burden of establishing that it would not be reasonable for him or her to relocate . . . ."). The record in this case suggests that relocation is a reasonable option because most of the violence between Dayaks and the Madurese were centered in Kalimantan. In fact, Surya lived in Jakarta without incident on at least three different occasions. Surya contends that he cannot relocate because of the transmigration program that relocated his family to Kalimantan. However, Surya has not shown that families that transmigrated to Kalimantan are required to remain there.

Surya's application for protection under Article 3 of the Convention Against Torture suffers from similar deficiencies. "Torture requires the infliction of severe pain or suffering, by or with the acquiescence of a public official." Tolego v. Gonzales, --- F.3d ---, 2006 WL 1725989, *3 (June 26, 2006). Surya has not shown that any of the acts he complains of were committed by, at the direction of, or with the acquiescence of public officials. He has not shown that the Indonesian government was unwilling to address problems of ethnic violence between Dayaks and the Madurese. In fact, Surya testified that he had no problems with the government of Indonesia. Therefore, he has not demonstrated that he is entitled to relief under Article 3.

For the foregoing reasons, we deny the petition for review.

_____