

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-2008

# Wong v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 06-3539

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Wong v. Atty Gen USA" (2008). *2008 Decisions*. Paper 583.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/583

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-3539
_____


SIOE TJEN WONG,

Petitioner

v.

ATTORNEY GENERAL OF
THE UNITED STATES,

Respondent

On Review of a Decision of the
Board of Immigration Appeals
(Agency No. A78-688-745)
Immigration Judge:  Charles M. Honeyman
_____


Submitted Under Third Circuit LAR 34.1(a)
March 11, 2008


Before:  FUENTES, CHAGARES, and ALDISERT, <u>Circuit
Judges</u>.


(Filed: August 20, 2008)


Joseph C. Hohenstein, Esq.
Orlow, Kaplan & Hohenstein
620 Chestnut Street, Suite 656
Philadelphia, PA 19106
*Counsel for Petitioner*

David V. Bernal, Esq.
Lance L. Jolley, Esq.
Ernesto H. Molina, Esq.
Jonathan Potter, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
*Counsel for Respondent*

_____

OPINION OF THE COURT

_____


CHAGARES, Circuit Judge.

Sioe Tjen Wong, a native and citizen of Indonesia, petitions for review of a final order of removal issued by the Board of Immigration Appeals (BIA). A Catholic Indonesian of Chinese descent, Wong claims that she has a well-founded fear of persecution in Indonesia because of her religion and her ethnicity. As we explain below, substantial evidence supports the BIA's denial of asylum, withholding of removal, and relief under the Convention Against Torture (CAT). Accordingly, we will deny Wong's petition for review.

I.

Born in 1962, Wong was raised in Situbondo, a city located in eastern Java. Six of Wong's brothers and sisters still live in eastern Java, as does her mother. Her siblings run businesses, and her mother works at home.

Wong entered the United States as a non-immigrant in August 1999 and overstayed her visitor's visa. She filed an application for asylum, withholding of removal, and protection under the CAT in July 2000 and was placed in removal

2

proceedings. In her application for relief, Wong claimed that ethnic Indonesians persecuted her because she was Chinese and Catholic and that the government failed to control or prevent the persecution. Wong asserted that in her hometown, ethnic Indonesians often broke the windows of Chinese homes when they smelled Chinese cooking, threatened ethnic Chinese residents with meat cleavers, and heckled them with ethnic slurs. According to Wong, "[o]ur churches [we]re burned, women [we]re assaulted and raped and people [we]re murdered by Muslims without any consequence at all." Administrative Record (A.R.) 984.

When Wong was growing up, anti-Chinese riots and attacks were widespread in Indonesia. Wong personally suffered several kinds of harassment and discrimination. For example, Wong recalled ethnic Indonesians lifting her skirt and grabbing her chest on the way to school. Ethnic Indonesians also stopped Wong in the street, demanded money, threw stones at her, and called her names on her way to church. According to Wong, she was not allowed to sing Christian songs in public or allowed to learn Chinese. Once, her parents tried to teach her Chinese, and an ethnic Indonesian, who overheard the lesson, threatened to burn down the store the Wongs owned as well as their house, if the lesson continued.

Wong pointed to several specific incidents in support of her application for relief from removal in her affidavit and at a hearing before the Immigration Judge (IJ). First, she explained that in 1967 the government confiscated businesses run by ethnic Chinese, including a store run by her parents. Her father opened another business in the 1970s, delivering and selling construction materials, but according to Wong, ethnic Indonesians often placed orders and then refused to pay for the materials. As a result, her father was forced to shut down the business. Her father then opened a small fishery, using the name of an ethnic Indonesian to start the business because as an ethnic Chinese he was not allowed a business license. This business failed too because "ethnic Indonesians constantly stole fish from [her] father and the ethnic Indonesian whose name [her] father had used caused [him] problems." A.R. 193. According to Wong, these business failures devastated her father and after the fishery business failed, he suffered a heart attack and died in June 1979.

3

In the early 1980s, Wong's family reacquired the store the government had confiscated in 1967. They had to pay the government for the store, however, and they were not compensated for the loss of the business during the years in which it was closed. To help her mother, Wong assisted with running the store and was harassed as a result. Wong stated that "[y]oung, drunk ethnic Indonesians often came to the store at night, threatening to burn the store down" and to burn her face with cigarettes if she did not give them money. A.R. 193-94.

In August 1992, an ethnic Indonesian struck Wong's brother on the back of the head as he was riding his motorcycle home from work. The assailant stole the motorbike, and Wong's brother was taken to the hospital, where he died. Although the hospital officials told Wong that her brother had lost too much blood to be saved, Wong asserts that "[n]othing was done to help my brother at the hospital because ethnic Chinese were required to pay before receiving treatment, even in emergency situations." A.R. 194. According to Wong, the family reported the incident to the police, but "there was no reaction." A.R. 565.

Wong officially changed her name from Sioe Tjen Wong to Veronica Wiyanti in March 1996, "so that [she] would not be identified as a person of ethnic Chinese descent and discriminated against." A.R. 192, 576, 665, 1000-01.[1] Later that year, in October 1996, there was rioting in Situbondo and the church Wong attended was twice set on fire. Christian schools and other churches in the town were also burned and in one church, a pastor and his family were killed. In November 1996, after the church burning incidents, Wong and her church choir were practicing in a tent near the church when a group of ethnic Indonesians threatened to burn them unless they stopped singing and praying. After these incidents, Wong could not attend church "because it was guarded by the Muslim fanatics." A.R. 570.

---

[1] However, an affidavit Wong submitted to the BIA states that she "was born with the name Veronica Wiyanti." A.R. 192.

Wong explained that in 1998, anti-Chinese riots were again rampant in Indonesia. Ethnic Indonesians burned houses and stores and raped Chinese women. Wong and her family hid in their house for days, while rioters threw stones and broke the front window. The anti-Chinese violence continued into 1999. According to Wong, she wanted to leave Indonesia immediately, but the U.S. embassy in Jakarta was closed for about a year after the 1998 riots. As a result, she was not able to obtain a visa to go to the United States until August 1999. After Wong left the country, she learned that her oldest sister had also died. According to Wong, the stress of constant harassment by ethnic Indonesians caused her sister's death.

Wong submitted news articles and reports discussing human rights and religious freedom in Indonesia, among other materials, to the IJ. After holding a hearing and reviewing Wong's testimony and application, the IJ concluded that the instances of discrimination and harassment that Wong experienced did not rise to the level of past persecution. According to the IJ, Wong also failed to identify any grounds to support a well-founded fear of persecution. In addition, Wong was unable to show a clear probability that she would be tortured if returned to Indonesia. As a result, the IJ denied Wong's application for relief on December 8, 2000, but granted her voluntary departure.

Wong appealed, and the BIA affirmed the IJ's denial of Wong's application for asylum, withholding of removal, and protection under the CAT without opinion on March 7, 2003. Wong timely filed a motion to reopen with the BIA.

After reviewing new reports on country conditions submitted by Wong, the BIA granted Wong's motion to reopen on August 29, 2003, and remanded for the IJ to consider evidence of changed country conditions in Indonesia during the three years since the original IJ decision.

On remand, a new IJ reviewed the updated evidence, including news articles, recent U.S. State Department reports, and an affidavit from an expert on Indonesia country conditions. Based on this evidence, the IJ considered whether Wong would be singled

out for persecution based on her ethnicity and religion and also assessed whether there was a "'pattern or practice' of persecution in Indonesia by forces that the government [wa]s unable or unwilling to control." A.R. 99. The IJ noted that "there [we]re no credibility issues in this case" and that the only issue on remand, therefore, was whether Wong had "a well-founded fear of future persecution in light of the absence of past persecution," or, in the alternative, whether Wong could meet "the higher standard of a clear probability of future persecution for withholding [of removal]" or demonstrate that it was "more probable than not [] that she would be tortured by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. . . ." A.R. 97.

The IJ explained that he was "constrained to conclude that the respondent has not proven by a preponderance of the evidence that she has a reasonable possibility of future persecution as that term has been defined in the case law if she were to return to Indonesia, absent a conclusion by either the BIA or the Circuit Court that such a pattern or practice conclusion would be supported by substantial evidence in this record." A.R. 109. On December 2, 2004, the IJ denied Wong's petition for asylum, withholding of removal, and relief under the CAT, but granted her voluntary departure.

Wong again appealed, and the BIA dismissed Wong's case on June 28, 2006. The BIA determined that Wong had failed to establish a pattern or practice of persecution of ethnic Chinese Christians in Indonesia and noted that the grant of asylum to Wong's husband was not dispositive of her asylum claim. The BIA observed that the U.S. State Department's 2003 and 2004 International Religious Freedom Reports for Indonesia (Religious Freedom Reports) indicated that the government had taken steps to control anti-Christian violence, and that violence continued only in specific parts of Indonesia.

Similarly, while the U.S. State Department's 2003 and 2004 Country Reports on Human Rights Practices for Indonesia

(Country Reports)[2] documented ongoing harassment and discrimination against ethnic Chinese in Indonesia, the reports indicated that violence had ended. The BIA also determined that Wong was not eligible for withholding of removal or relief under the CAT.

This timely petition for review followed.

II.

We have jurisdiction to review a final order of removal under 8 U.S.C. § 1252. See Briseno-Flores v. Att'y Gen., 492 F.3d 226, 228 (3d Cir. 2007). Removal proceedings occurred in Philadelphia, Pennsylvania, and venue is therefore proper under 8 U.S.C. § 1252(b)(2).

Where the BIA renders its own decision and does not merely adopt the opinion of the IJ, we review the BIA's decision, not that of the IJ. Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002). The BIA is bound by the IJ's factual determinations "including findings as to the credibility of testimony" and reviews these findings only to determine whether they are clearly erroneous. 8 C.F.R. § 1003.1(d)(3). "The BIA's conclusions regarding evidence of past persecution and the well-founded fear of persecution are findings of fact," which we review under the deferential substantial evidence standard. Chavarria v. Gonzalez, 446 F.3d 508, 515 (3d Cir. 2006).

We defer to the BIA's findings "if they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Lie v. Ashcroft, 396 F.3d 530, 534 n.3 (3d Cir. 2005) (quoting I.N.S. v. Elias-Zacarias, 502 U.S. 478, 480 (1992)). Under the deferential substantial evidence standard, the BIA's findings "must be upheld unless the evidence not only supports a contrary conclusion, but compels it." Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir. 2001) (citing Elias-Zacarias,

_____

[2]We refer to the Country Reports and Religious Freedom Reports, collectively, as "the State Department reports."

7

502 U.S. at 481 & n.1); see 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. . . ."). In addition, where, as here, "the IJ did not make an adverse credibility determination [], we proceed as if the alien's testimony was credible." Ghebrehiwot v. Att'y Gen., 467 F.3d 344, 350 (3d Cir. 2006).

We have plenary review over questions of law, "subject to the principles of deference articulated in Chevron v. Natural Resources Defense Council, 467 U.S. 837, 844 [] (1984)." Pierre v. Att'y Gen., 528 F.3d 180, 184 (3d Cir. 2008) (citing Briseno-Flores, 492 F.3d at 228; Wang v. Ashcroft, 368 F.3d 347, 349 (3d Cir. 2004)).

## III.

As a threshold matter, we reject Wong's argument that the BIA issued a decision that "failed to provide 'meaningful review'" of the IJ's decision. Pet'r Br. at 8-9. Contrary to Wong's contentions, the BIA's explanation of its reasoning is sufficiently detailed for this Court to review.

In support of her argument, Wong relies on Miah v. Ashcroft, 346 F.3d 434 (3d Cir. 2003), in which we held that the BIA's failure to explain its reasoning precluded this Court from conducting a meaningful review of its analysis. In Miah, the BIA rejected the IJ's determination that the petitioner was not credible, but then adopted the IJ's reasoning as to corroboration. The BIA did not analyze how its assessment that the petitioner's testimony was credible affected the degree of corroboration necessary for the petitioner to meet his burden of proof. Because the BIA "adopted a conclusion of the IJ after rejecting the finding of the IJ which informed that conclusion," we concluded that "meaningful review of the BIA's decision" was not possible. Id. at 440; see also Awolesi v. Ashcroft, 341 F.3d 227, 233 (3d Cir. 2003) (noting that "we are particularly concerned about being able to give meaningful review to the BIA's decision where the BIA reverses the IJ without explanation" (emphasis in original)).

8

Here, in contrast, the BIA did not reject the IJ's decision. Rather, the BIA considered the merits of Wong's asylum, withholding of removal, and CAT claims and dismissed Wong's appeal. The BIA considered the 2003 and 2004 State Department reports and concluded that there was no pattern or practice of persecution of ethnic Chinese in Indonesia. As we have previously observed, "[w]e will not hold [] that a BIA decision is insufficient merely because its discussion of certain issues 'could have been more detailed.'" Toussaint v. Att'y Gen., 455 F.3d 409, 414 (3d Cir. 2006) (concluding that the BIA's two-page decision provided the Court with adequate insight into its reasoning and allowed for a meaningful review) (quoting Sevoian v. Ashcroft, 290 F.3d 166, 178 (3d Cir. 2002)). The BIA need not "'write an exegesis on every contention.'" Toussaint, 455 F.3d at 414 (quoting Zubeda v. Ashcroft, 333 F.3d 463, 477 (3d Cir. 2003)). Although the BIA's explanation in the instant case is brief, we conclude that the decision is nonetheless sufficiently detailed to allow for meaningful review. Accordingly, we turn to the merits of the BIA's decision.

IV.

Wong contends that the BIA's decision is not supported by substantial evidence. Specifically, Wong argues that the BIA failed to consider the entire record in assessing the objective basis for her fear of persecution, applied the incorrect legal standard in analyzing her claim, erred in introducing the concept of relocation within Indonesia, and misinterpreted her argument regarding her husband's asylee status. We disagree. While the record does indicate that Chinese Christians in Indonesia are victims of harassment and intimidation, we cannot say that they are subject to a pattern or practice of persecution as defined in Lie, 396 F.3d at 536. As we explain further below, the record does not compel a finding that Wong has a well-founded fear of persecution.

The Attorney General may grant asylum to an alien in removal proceedings if the alien establishes that he or she is a "refugee" under the Immigration and Nationality Act (INA). 8 U.S.C. § 1158(a), (b). The INA defines "refugee" as

9

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country <u>because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion</u> . . . .

<u>Id.</u> § 1101(a)(42)(A) (emphasis added). A person seeking asylum bears the burden of demonstrating that he or she meets this definition. <u>Id.</u> § 1158(b)(1)(B)(I).

Persecution includes "'threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.'" <u>Kibinda v. Att'y Gen.</u>, 477 F.3d 113, 119 (3d Cir. 2007) (quoting <u>Fatin v. I.N.S.</u>, 12 F.3d 1233, 1240 (3d Cir. 1993)). However, persecution "'does not encompass all treatment our society regards as unfair, unjust or even unlawful or unconstitutional.'" <u>Id.</u> (quoting <u>Fatin</u>, 12 F.3d at 1240); <u>see</u> <u>Jarbough v. Att'y Gen.</u>, 483 F.3d 184, 191 (3d Cir. 2007) (noting that "[a]busive treatment and harassment, while always deplorable, may not rise to the level of persecution"); <u>Lie</u>, 396 F.3d at 536 (explaining that robberies motivated by ethnicity do not constitute persecution); <u>Firmansjah v. Gonzales</u>, 424 F.3d 598, 605 (7th Cir. 2005) (determining that a requirement to change one's name based on ethnicity is not enough to establish a claim for persecution).

The well-founded fear of persecution standard has both a subjective and an objective component. <u>See</u> <u>Ghebrehiwot</u>, 467 F.3d at 351. First, an applicant must show that his or her subjective fear is genuine and second that "'a reasonable person in the alien's circumstances would fear persecution if returned to the country in question.'" <u>Guo v. Ashcroft</u>, 386 F.3d 556, 564-65 (3d Cir. 2004) (quoting <u>Zubeda</u>, 333 F.3d at 469).

Wong's subjective fear of persecution is not contested. As noted above, Wong presented credible testimony and neither the IJ nor the BIA questioned the genuine nature of her fear of

10

persecution. Rather, the key issue herein is whether the record compels a finding that Wong's fear is objectively reasonable and that she has a well-founded fear of persecution.

An applicant can satisfy the objective prong of the well-founded fear of persecution standard in two ways: by showing that he or she "would be individually singled out for persecution" or by "demonstrat[ing] that 'there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .'" Lie, 396 F.3d at 536 (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)). As part of a pattern or practice claim, an applicant must "establish[] his or her own inclusion in, and identification with, such group of [similarly situated] persons such that his or her fear of persecution upon return is reasonable." 8 C.F.R. § 208.13(b)(2)(iii)(B).

Although the regulations do not define the meaning of a "pattern or practice of persecution," we explained in Lie that "to constitute a 'pattern or practice,' the persecution of the group must be 'systemic, pervasive, or organized.'" 396 F.3d at 537 (quoting Ngure v. Ashcroft, 367 F.3d 975, 991 (8th Cir. 2004)). The BIA has adopted the definition of "pattern or practice of persecution" set forth in Lie, see In re A-M-, 23 I. & N. Dec. 737, 740-41 (BIA 2005), as have other courts. See, e.g., Wijono v. Gonzales, 439 F.3d 868, 874 (8th Cir. 2006) ("[T]he persecution of the group must be 'systemic, pervasive, or organized.'") (quoting Ngure, 367 F.3d at 991); Mitreva v. Gonzales, 417 F.3d 761, 765 (7th Cir. 2005) (noting that "persecution of a protected group must be 'extreme,'" "[t]here must be a 'systematic, pervasive, or organized' effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetrated or tolerated by state actors") (citations omitted); Woldemeskel v. I.N.S., 257 F.3d 1185, 1191 (10th Cir. 2001) (defining "pattern or practice of persecution" as "'something on the order of systematic or pervasive persecution'") (quoting Makonnen v. I.N.S., 44 F.3d 1378, 1383 (8th Cir. 1995); cf. Mufied v. Mukasey, 508 F.3d 88, 93 (2d Cir. 2007) (citing the need for further clarification of the standard and remanding for BIA to "elaborate upon the 'systemic, pervasive, or

11

organized' standard"); <u>Sahi v. Gonzales</u>, 416 F.3d 587, 589 (7th Cir. 2005) (noting that the BIA has not "explain[ed] the distinction between mere harassment and outright persecution" and remanding for BIA to define what constitutes religious persecution).

In addition, for purposes of a pattern or practice claim, "as with any claim of persecution, violence or other harm perpetrated by civilians against the petitioner's group does not constitute persecution unless such acts are committed by the government or forces the government is either unable or unwilling to control." <u>Lie</u>, 396 F.3d at 537 (quotation marks omitted). Nor do "general unrest and violence . . . support an asylum claim standing alone . . . ." <u>Konan v. Att'y Gen.</u>, 432 F.3d 497, 506 (3d Cir. 2005).

A.

Wong's contention that the State Department reports and other background materials document a pattern or practice of persecution of Chinese Christians in Indonesia is without merit. It is well-established that "[a]n alien may demonstrate that his/her [well-founded fear of persecution] is objectively reasonable by documentary or expert evidence about the conditions in a given country." <u>Lusingo v. Gonzales</u>, 420 F.3d 193, 199 (3d Cir. 2005). The evidence in this record, however, does not support Wong's claim.

Although the 2003 and 2004 State Department reports document ongoing harassment of Chinese Indonesians and isolated incidents of anti-Christian violence, including the burning of seven churches in 2003 and ten churches in 2004, the reports do not indicate that such violence is widespread or systemic. In fact, according to the 2004 Country Report, "discrimination and harassment of ethnic Chinese Indonesians declined compared with previous years." A.R. 69. Moreover, the State Department reports generally emphasize the steps taken by the Indonesian government to promote religious, racial, and ethnic tolerance and to reduce interreligious violence. The reports indicate that private parties,

12

not government officials, are the predominant cause of harassment and violence.[3]

Indeed, other courts of appeals considering the same 2003 and 2004 Country Reports have rejected similar pattern or practice claims of persecution on the grounds that violence against Chinese Christians in Indonesia has declined, cooperation among groups has increased, and government officials have neither acquiesced to nor engaged in the persecution of Chinese Christians as a group. See, e.g., Kho v. Keisler, 505 F.3d 50, 54, 58 & n.7 (1st Cir. 2007) (finding "no ongoing pattern or practice of persecution against ethnic Chinese or Christians in Indonesia" and citing the State Department's 2004 Country Report for the lack of evidence of government action or inaction in anti-Chinese harassment); Tolego v. Gonzales, 452 F.3d 763, 766 (8th Cir. 2006) (reviewing the 2003 and 2004 State Department Country Reports and rejecting petitioner's claim for withholding of removal based on a pattern or practice of persecution against Chinese Christians in Indonesia). Furthermore, although not relevant to the decision in this case, more recent State Department reports from 2005 to 2007 document similar or improved treatment of Chinese Christians in Indonesia.[4]

---

[3]Wong is correct that the factual findings in Lie, which were based on a now-outdated 1999 Country Report, are not dispositive in this case. Yet, contrary to Wong's contention, the BIA did not rely on the factual findings in Lie in assessing the merits of Wong's claim. Rather, the BIA based its ruling that there was no pattern or practice of persecution of ethnic Chinese Christians in Indonesia on the record before it, which included the 2003 and 2004 State Department reports, discussed above.

[4]It is important to note that these recent reports are not part of the record and do not therefore control our decision-making. Berishaj v. Ashcroft, 378 F.3d 314, 328 (3d Cir. 2004) ("It is a salutary principle of administrative law review that the reviewing court act upon a closed record."). Although other courts of appeals have taken judicial notice of new country reports released after a final agency determination, see, e.g., Pelinkovic v. Ashcroft, 366 F.3d 532, 540-41 (7th Cir. 2004), we have declined to do so. See Berishaj, 378 F.3d at 330 (explaining that we have followed "the

13

Wong's argument that the BIA did not apply the correct legal standard is unpersuasive. Although the BIA did not expressly cite the "systemic, pervasive, or organized" standard set forth in Lie, 396 F.3d at 537, the BIA properly reviewed the record and determined that violence was not sufficiently widespread and incidents of harassment and discrimination were not sufficiently severe to constitute a pattern or practice of persecution.

Moreover, Wong's reliance on Sael v. Ashcroft, 386 F.3d 922 (9th Cir. 2004), and Eduard v. Ashcroft, 379 F.3d 182 (5th Cir. 2004), is unavailing. Contrary to Wong's contention, the Court of Appeals for the Ninth Circuit's factual finding in Sael that the Chinese were "scapegoats" in Indonesia is not "a persuasive evaluation of country conditions," as the decision was based on now-outdated country condition information from 1998, 1999, and 2000. Pet'r Br. at 21.[5] The Court of Appeals for the Fifth Circuit's

clear command from SEC v. Chenery Corp., 318 U.S. 80 [] (1943), that courts reviewing the determination of an administrative agency must approve or reject the agency's action purely on the basis of the reasons offered by, and the record compiled before, the agency itself").

For informational purposes only, we note that the 2007 Country Report, for example, states that attacks against churches in West and East Java, where Wong's hometown is located, were "less frequent" than in the past. The 2007 Religious Freedom Report observes that while "extremist groups used violence and intimidation to force eight small, unlicensed churches and one Ahmadiyya mosque to close," the government and the public generally respected religious freedom. According to the report, the government took steps to promote interfaith dialogue, and the president gave a speech to reassure Chinese Indonesians "that their rights were legally and constitutionally guaranteed."

[5]In addition, we have previously rejected the "disfavored group" analysis in Sael, and we will not revisit that decision here. See Lie, 396 F.3d at 538 n.4. In any event, the Court of Appeals for the Ninth Circuit itself appears to have moved away from its reasoning in Sael. See Lolong v. Gonzales, 484 F.3d 1173, 1180-

14

decision in <u>Eduard</u> is similarly unpersuasive. There, the court based its finding of a pattern and practice of persecution on country conditions in Indonesia in 2000. The factual determination as to a pattern or practice claim must, however, be based on the most current information in the record (in this case, the State Department reports from 2004), not on outdated information from 2000. <u>See</u> <u>Sukwanputra v. Gonzales</u>, 434 F.3d 627, 637 & n.10 (3d Cir. 2006) (remanding for the BIA to consider petitioners' pattern or practice claim in light of the 2001 Country Report in the record and noting that the <u>Lie</u> decision was not controlling because it was based on an outdated 1999 Country Report).

Furthermore, as the Court of Appeals for the Seventh Circuit observed in distinguishing <u>Eduard</u>, "each of the other circuits to address the issue has declined to find a pattern or practice of persecution of Christian Indonesians of Chinese descent." <u>Kaharudin v. Gonzales</u>, 500 F.3d 619, 624 n.4 (7th Cir. 2007) (citing <u>Lolong</u>, 484 F.3d at 1180-81; <u>Tolego</u>, 452 F.3d at 766; <u>Tulengkey v. Gonzales</u>, 425 F.3d 1277, 1281-82 (10th Cir. 2005)); <u>see also</u> <u>Kho</u>, 505 F.3d at 54-55; <u>In re A-M-</u>, 23 I. & N. Dec. at 741 ("We do not find . . . on the record before us, that the threat of harm to Chinese Christians in Indonesia by the Government, or by forces that the Government is unable or unwilling to control, is so systemic or pervasive as to amount to a pattern or practice of persecution."). Accordingly, the record before us does not compel a finding of a pattern or practice of persecution of Chinese Christians in Indonesia.

B.

Wong's remaining arguments that the BIA (1) incorrectly introduced the concept of relocation within Indonesia and (2) failed

_____

81 (9th Cir. 2007) (en banc) (acknowledging "history of ethnic and religious strife" in Indonesia, including attacks on Chinese Christians, but concluding that "the record supports the BIA's conclusion that Lolong has not shown that the Indonesian government is unable or unwilling to control the perpetrators of this violence").

to consider the importance of her husband's grant of asylum are unpersuasive.

First, as the Government correctly notes, "[e]ven assuming the Board 'improperly introduced' the issue of internal relocation, . . . the issue was not determinative to the [IJ]'s findings of fact in this case. . . . The [IJ] found, and the Board agreed, that [] Wong did not establish a pattern or practice of persecution of Chinese Christians in Indonesia." Gov't Br. at 17-18 n.3. As we explained above, in order to establish a well-founded fear of persecution, Wong needed to demonstrate an objectively reasonable fear of persecution. Without evidence of a pattern or practice of persecution of Chinese Christians in Indonesia or that she would be individually singled out for persecution, Wong's claim necessarily fails.

Second, Wong's argument that she should be granted asylum because her husband, a Chinese Christian from the east end of Java, faced similar experiences and was granted asylum in 2001 is also unpersuasive. Wong cites Gebremichael v. I.N.S., 10 F.3d 28 (1st Cir. 1993), for the proposition that "[t]he persecution of a family member is a relevant concern for an asylum claim, especially where it is feared on the same basis as an applicant." Pet'r Br. at 16. It is true that successful asylum applications by family members can be relevant to a petitioner's claim. See, e.g., Cham v. Att'y Gen., 445 F.3d 683, 693 (3d Cir. 2006) (noting relevance of persecution of family members, particularly where "there is a high degree of factual similarity between the applicant's claim and those of his family members, and where his claim of political persecution rests on that very familial relationship").

Yet, as the Government correctly notes, Wong has not provided any details as to her husband's claim and we therefore cannot assess its similarity or relevance to her claim. It is clear that Wong "cannot rely solely on the persecution of [her] family members to qualify for asylum or bootstrap" one case onto

16

another.[6]  Id. (citations and quotation marks omitted); see also Surya v. Gonzales, 454 F.3d 874, 878 (8th Cir. 2006) ("[A]ttacks on family members, absent a pattern of persecution tied to the applicant, do not establish a well-founded fear of persecution; nor do isolated acts of violence.").  Contrary to Wong's contentions, the grant of asylum to her husband does not assist Wong in establishing her claim.

Furthermore, Wong's siblings and mother still live in Indonesia and practice Catholicism, undermining her claim to a well-founded fear of persecution in Indonesia.  See Setiadi v. Gonzales, 437 F.3d 710, 714 & n.3 (8th Cir. 2006) (rejecting petitioner's claim to a well-founded fear of persecution where Christian relatives remained unharmed in contentious part of Indonesia and noting that "there are many possible areas in Indonesia where [petitioner] and his family could relocate"); Nikijuluw v. Gonzales, 427 F.3d 115, 122 (1st Cir. 2005) (noting that petitioner's Christian relatives lived peaceably in Indonesia and determining that "[w]hile a reasonable person in the petitioner's position might fear encountering some private hostility in a majority Muslim country on account of his Christian Protestant beliefs, the record does not make manifest any objective basis for a fear of persecution").

Although we are sympathetic to Wong's plight, harassment and discrimination do not constitute persecution.  The 2003 and 2004 State Department reports indicate that attacks on Chinese Christians continued in certain areas, but violence was not widespread, and the Indonesian government was taking steps to control it.  Moreover, as documented in the State Department reports, the Indonesian government has shown a general commitment to freedom of religion, as well as to ethnic tolerance. Wong has not demonstrated an objectively reasonable fear of

---

[6]Wong submitted an I-730 petition to qualify her as a derivative asylee based on her husband's asylee status, but she concedes that we do not have jurisdiction over that petition, and we will therefore not address it further.

persecution, and we hold that the BIA's decision is supported by substantial evidence.

## V.

Wong also seeks relief in the form of withholding of removal and protection under the CAT. These claims also fail.

To qualify for withholding of removal, a petitioner must "establish a clear probability," meaning "that it is more likely than not, that he/she would suffer persecution." Ghebrehiwot, 467 F.3d at 351 (quotation marks omitted). Where, as here, a petitioner has not met her burden of proof with respect to asylum, the petitioner is also not eligible for withholding of removal. See, e.g., Guo, 386 F.3d at 561 n.4. Wong has not established a well-founded fear of persecution and, as a result, also cannot show a "clear probability" of persecution in Indonesia because of her status as a Chinese Christian.

In addition, although Wong's initial application for relief included a CAT claim, Wong fails to challenge the BIA's denial of relief under the CAT, and we will therefore not consider her CAT claim. See, e.g., Sukwanputra, 434 F.3d at 636 n.8.

## VI.

For the foregoing reasons, we will deny Wong's petition for review.

18