

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-9-2009

# Gordeziani v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-2538

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Gordeziani v. Atty Gen USA" (2009). *2009 Decisions.* Paper 1558.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1558

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 08-2538

PAATA GORDEZIANI; KETEVAN GORDEZIANI;
JEMAL GORDEZIANI; GVANTSA GORDEZIANI,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
BIA Nos. A96-017-743, A96-017-744,
A96-017-745, A96-017-746
(U.S. Immigration Judge: Honorable Roxanne C. Hladylowycz)

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 8, 2009
Before:  SCIRICA, Chief Judge, CHAGARES and ALDISERT, Circuit Judges

(Filed: April 9, 2009)

OPINION OF THE COURT

PER CURIAM.

Petitioners seek review of the Board of Immigration Appeals' ("BIA") final order

of removal.  For the following reasons, we will deny the petition.

The lead petitioner is Ketevan Gordeziani, and the others are her husband (Paata) and their two children. All are natives and citizens of Georgia. They arrived in the United States in December 2002 without valid documents and they concede removability on that basis. They applied for asylum, withholding of removal and relief under the Convention Against Torture ("CAT") on the basis of Ketevan's involvement with the Jehovah's Witnesses. (There is some dispute about whether Ketevan is a full-fledged member of the Jehovah's Witnesses, but that dispute is immaterial to the issues on review and we will assume that she is.)[1]

Before the Immigration Judge ("IJ"), petitioners presented testimony and other evidence regarding civilian harassment of and violence against Jehovah's Witnesses in Georgia. Ketevan testified that she became involved with the Jehovah's Witnesses in 2001. In September 2001, a mob armed with sticks and stones broke up a worship meeting that she was attending with several other people, but she and the others escaped unharmed through a back door. She attributed this attack to followers of a radical Orthodox priest named Basil Magosvili. Shortly thereafter, she began receiving anonymous death threats over the telephone. She testified that she usually received multiple threats per day and may have received as many as 1,200 in all, both at the

---

[1]Petitioners also applied on the basis of a nebulous claim by her husband, a former police officer, that he feared harm from forces "inside and outside" the police department, but they did not raise that claim before the BIA and have not raised it here.

family's house and after the family moved in with her husband's father, before finally fleeing Georgia. Her husband testified in substantially the same manner. In addition to their testimony, petitioners presented, inter alia, articles regarding the treatment of Jehovah's Witnesses and the Department of State's International Religious Freedom Reports from 2002 through 2006.

The IJ found petitioners not credible because she thought their testimony implausible for several reasons, but she explained that she would have denied their claims even if she believed them. The IJ concluded that petitioners had not suffered past persecution and had not shown a well-founded fear of future persecution. In particular, the IJ noted that Basil Magosvili and another of his followers had been arrested, convicted and imprisoned for fomenting religious-based violence, and that his "followers have in many ways been demobilized." The IJ also concluded that petitioners had failed to meet their higher burden of proof for purposes of withholding of removal and CAT.

On appeal, the BIA did not address the adverse credibility finding, but stated that it "adopted" the IJ's decision "insofar as the [IJ] found that even assuming the credibility of the testimony presented, the respondents failed to establish eligibility for relief." The BIA then explained that petitioners had shown neither past persecution nor a "well-founded fear of harm rising to the level of persecution by persons the government is unwilling or unable to control." The BIA further explained why it believed that the potential harm mentioned in the most recent country report did not rise to the level of

3

persecution and could not be attributed to the Georgian government. Petitioners seek review.[2]

## II.

In their briefs, petitioners have expressly abandoned their CAT claim, have not addressed their claim for withholding of removal, and have conceded that they did not suffer past persecution, which would have made them presumptively eligible for asylum. Thus, we review only their claim that they have a well-founded fear of future persecution if returned to Georgia.

In order to succeed on that claim, petitioners bore the burden of establishing that their fear of mistreatment on return to Georgia is both subjectively genuine and objectively reasonable—i.e., that mistreatment is a reasonable possibility, such that a reasonable person in their situation would fear it. See Sioe Tjen Wong, 539 F.3d at 232. They also bore the burden of establishing that such mistreatment both rises to the level of

---

[2]We have jurisdiction to review petitioners' final order of removal under 8 U.S.C. § 1252(a)(1). Our review extends only to the BIA's decision but, because the BIA both adopted a portion of the IJ's decision and engaged in its own analysis, we review both the IJ's and BIA's reasoning. See Kayembe v. Ashcroft, 334 F.3d 231, 234 (3d Cir. 2003). We review the BIA's factual findings for substantial evidence and must treat them "as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Sioe Tjen Wong v. Att'y Gen., 539 F.3d 225, 230 (3d Cir. 2008) (citations omitted). We have plenary review over its conclusions of law, subject to established principles of deference on agency review. See id. at 231. In conducting our review, we assume that petitioners' testimony was credible because the BIA neither adopted the IJ's adverse credibility determination nor made one of its own. See Kayembe, 334 F.3d at 234-35.

4

persecution and is attributable either to the Georgian government or to forces that it is unable or unwilling to control. See id. at 232-33.

Here, the IJ concluded that petitioners' fear of persecution is not objectively reasonable because the imprisonment of Basil Magosvili and the 2006 country report indicate that petitioners have "nothing to fear" if returned to Georgia.[3] The BIA adopted that conclusion. In addition, it concluded that the harm petitioners fear does not rise to the level of persecution because the 2006 country report describes only "sporadic harassment and occasional threats," and that such actions could not be attributed to the Georgian government or forces that it is unable or unwilling to control. Either of those conclusions, if supported by substantial evidence, would be sufficient to support the BIA's ruling. Petitioners raise no challenge in their briefs to the first of these conclusions, so we could deny their petition on that basis alone. In any event, our review of the record confirms that the BIA's second conclusion is supported by substantial evidence.

The BIA based this conclusion on the 2006 country report, which, as the BIA noted, states that the Georgian government and Orthodox Church are separate under the

---

[3]The IJ also concluded that petitioners failed to prove that they "will be" subjected to future persecution. As explained above, the relevant standard is whether persecution is reasonably possible, not whether petitioners have "nothing to fear" or "will be" persecuted. See Sioe Tjen Wong, 539 F.3d at 232. Earlier in her decision, however, the IJ recited the correct standard, (IJ Dec. at 9), so there is no basis to conclude that the IJ (or BIA) applied the wrong legal standard in this regard, as petitioners argue for the first time in their reply brief.

Georgian constitution and indicates that "the government in Georgia has taken steps to prosecute, convict, and jail religious radicals" who participated in religious-based violence and harassment. (BIA Dec. at 2.) In particular, as both the IJ and BIA noted, the 2006 State Department describes the arrest and conviction of Basil Magosvili and another of his followers, who have been sentenced to six and four years imprisonment, respectively. The report also describes increasing efforts on the part of the Georgian government to prevent religious-based violence and a continuing decrease in such violence. See, e.g., A.288 (noting that "[p]olice were generally more responsive to the needs of religious minorities"); A.289 (noting that "[t]he criminal code specifically prohibits interference with worship services [and] persecution of a person based on religious faith or belief," and that the governmental agencies "have become more active in the protection of religious freedom"); A.290 (noting that "Jehovah's Witnesses no longer believed it necessary to hold services in private homes for security reasons").

Petitioners do not directly argue that the BIA erred in concluding that such harassment as continues is not attributable to governmental action or acquiescence. Instead, they argue that the IJ's fundamental misunderstanding of the facts and the BIA's adoption of the IJ's conclusion effectively denied them meaningful review. Petitioners raise four specific arguments in this regard, but only the last touches on the issue of

6

whether the mistreatment they fear is attributable to the Georgian government.[4]

Petitioners' fourth argument takes issue with the IJ's conclusion that they "have nothing to fear" if returned to Georgia. Petitioners argue that "no reasonable fact finder reading the State Department reports as well as the other human rights reports in the record could find that a Jehovah's Witness returning to Georgia would have nothing to fear." In particular, they note that the 2006 report, though stating that attacks on Jehovah's Witnesses and other religious minorities continued to decrease, reports several instances of continuing harassment and attacks. They further note that the report states that "[o]n some occasions . . . local police were slow to prevent the harassment" of Jehovah's Witnesses and describes one incident in a particular town in which "numerous

---

[4]Petitioners' first three arguments are not relevant to any issue on review. Petitioners argue first that the IJ erred in concluding that they did not have "anything happen to them" in Georgia when in fact the lead petitioner was driven from a worship service by a mob and received threatening telephone calls. The IJ, however, expressly made this statement in ruling that petitioners had not suffered past persecution, as they now concede (and in any event clearly was aware of petitioners' claims in that regard). Petitioners' second argument is that the IJ failed to credit their explanation for not reporting the telephone calls to police and believed that they "did nothing" in response to the threats, though they in fact moved to the husband petitioner's parents' house. The IJ, however, expressly relied on these circumstances only for purposes of petitioners' credibility, which we assume, and in any event specifically noted the move that petitioners claim she overlooked. (IJ Dec. at 12.) Finally, petitioners argue that the IJ misunderstood the lead petitioner's testimony about when she became involved with the Jehovah's Witnesses and wrongly held against them the fact that her children remained without harm in Georgia during a period before she had become involved with the Jehovah's Witnesses. Though this argument is otherwise well-taken, it is irrelevant to the BIA's conclusion that the mistreatment petitioners fear cannot be attributed to the Georgian government or forces that it is unable or unwilling to control.

7

investigations were launched . . . into reports that the police had been slow to respond to the violence and then themselves threatened the Jehovah's Witnesses." (A.293.) Finally, they point to other articles noting that, although the Georgian government has arrested and convicted Basil Magosvili, it has not prosecuted others who participated in religious-based harassment and violence in the past. Thus, petitioners implicitly take issue with the BIA's conclusion that any mistreatment they fear is not attributable to the Georgian government or forces it is unable or unwilling to control.

As explained above, however, the BIA's conclusion is supported by substantial evidence. The fact that some attacks continue despite the Georgian government's increasingly-effective efforts to prevent them does not provide a basis to disturb the BIA's ruling. Neither does the isolated incident described in the 2006 report in which police "threatened" Jehovah's Witnesses—an incident, as the report states, into which "numerous investigations were launched." (A.293.) Finally, although the Georgian government may not have prosecuted others who participated in religious-based harassment or violence in the past, the reports confirm that the government is actively attempting to prevent such conduct in the future and that its efforts have been increasingly successful. In sum, the evidence of record arguably would have supported a conclusion contrary to the BIA's for the reasons argued by petitioners, but it does not compel one. See Kayembe, 334 F.3d at 236-37 (explaining that State Department report that "cuts both ways" nevertheless constitutes substantial evidence when it would not compel a

8

reasonable adjudicator to draw a contrary conclusion).  Accordingly, the petition for review will be denied.