**IMG-125** **NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-1303 & 10-3355
_____

HERMANAWAN TANZIL,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A096-203-764)
Immigration Judge:  Honorable Rosalind K. Malloy
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 2, 2011
Before:  BARRY, HARDIMAN AND COWEN, Circuit Judges

(Opinion filed: May 4, 2011)
_____

OPINION
_____

PER CURIAM

        Hermanawan Tanzil, a native and citizen of Indonesia, petitions for review of two

Board of Immigration Appeals (BIA) decisions denying his motions to reopen.  We

consolidated the cases and will now deny the petitions for review.

I.

Given the narrow ambit of our review, we will only briefly recapitulate the background of this case. Tanzil is an ethnic Chinese Christian from Indonesia, who traveled to the United States for pleasure and overstayed his visa. After the commencement of removal proceedings, he filed for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Tanzil appeared before Immigration Judge (IJ) Rosalind K. Malloy, who determined that his failure to file within the one-year deadline rendered him statutorily ineligible for asylum. See Certified Administrative Record (A.)[1] 275. The IJ also held that Tanzil had failed to demonstrate (based on the facts of his case and his evidentiary submissions) a pattern or practice of persecution against ethnic Chinese or specific instances of past persecution; accordingly, she denied withholding and protection under the CAT. A.279–80. The BIA agreed, denying his appeal of the withholding and CAT claims. A.245–46.

We held that substantial record evidence supported the agency's outcome, and denied Tanzil's petition for review of the denial of withholding of removal. See Tanzil v. Att'y Gen., 330 F. App'x 396, 397 n.1, 399 (3d Cir. 2009). In so doing, we addressed Tanzil's claim that his evidence demonstrated a "pattern or practice" of persecution against ethnic Chinese in Indonesia, noting that the 2003 and 2004 country reports on Indonesia, which were part of his evidentiary submission, did not compel such a

---

[1] All citations are to the administrative record submitted in C.A. No. 10-3355, which is the more comprehensive and up-to-date of the two.

conclusion—an issue we had addressed in Sioe Tjen Wong v. Att'y Gen., 539 F.3d 225, 233–34 (3d Cir. 2008). But we also reviewed the other background materials Tanzil submitted, finding that they too did not mandate an outcome in his favor. Tanzil, 330 F. App'x at 398.

Since that time, Tanzil has filed two functionally identical motions to reopen and reconsider with the BIA. In his first, submitted on June 29, 2009, Tanzil presented "evidence [that] was not available at the time of the briefing that was submitted in 2007" to support his contention that "conditions are worsening, not improving in Indonesia for people like the Respondents [*sic*]." A.82. The evidence consisted of an Indonesian government report and a "rebuttal" NGO report on human-rights conditions and discrimination in Indonesia, along with a transcript of testimony given by Dr. Jeffrey Winters "from a substantially similar case of a claim by ethnic Chinese Indonesians for asylum." A.82. Tanzil argued that "[t]he additional evidence submitted directly contradict[ed] the final Board findings and is consistent with Dr. Winters' testimony," in that it demonstrated "a pattern or practice of persecution" rooted in "a *de jure* system of discriminatory laws." A.85–86. Moreover, the new submissions "clearly show[ed] that the Government of Indonesia cannot or will not protect its Chinese and Christian citizens from private Islamic fundamentalists." A.88.

The BIA disagreed, denying the motion to reopen because the "evidence [did] not meaningfully reflect 'changed country' conditions in Indonesia sufficient to warrant the reopening of proceedings." A.56. In doing so, it described the Indonesian government

3

report as being of "an uncertain origin." It also advised Tanzil that his reliance on the Ninth Circuit's "disfavored group" analysis was misplaced, given this Circuit's rejection of that standard. A.56.

Tanzil responded to this adverse ruling by filing a petition for review with this Court. He then submitted a second motion to reopen or to reconsider with the BIA "based on the Board's incorrect finding that an Exhibit submitted by the Respondent in support of his Motion was of uncertain origin.'" A.9. He further complained that the BIA's decision was "completely devoid of any consdieration [*sic*] of this document, much less of the fact that it constitutes the official Indonesian government statement on discrimination." A.9. The BIA granted the motion to reconsider, but affirmed its earlier ruling that the contents of the government report, "considered along with the documentation submitted in support of the motion to reopen filed on June 22, 2009, [did not] warrant the reopening of proceedings insofar as the documents do not meaningfully reflect changed conditions in Indonesia." A.3. Tanzil filed a second petition for review with this Court.

## II.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). Recognizing that motions to reopen, which are governed in the immigration agency context by 8 C.F.R. § 1003.2(c),[2] are entitled to the deference normally afforded an agency's interpretations

---

[2] We agree with the Government that Tanzil's motions to reopen were filed long after the time period allowed by the applicable regulations. The BIA rendered its merits

4

of its own regulations, we review the BIA's decisions for abuse of discretion. See INS v. Doherty, 502 U.S. 314, 323 (1992); Borges v. Gonzales, 402 F.3d 398, 404 (3d Cir. 2005). "Discretionary decisions of the BIA will not be disturbed unless they are found to be 'arbitrary, irrational or contrary to law.'" Tipu v. INS, 20 F.3d 580, 582 (3d Cir. 1994) (citations omitted).[3]

---

decision on March 25, 2008; Tanzil's first motion was filed on June 19, 2009. This is significantly "later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened." 8 C.F.R. § 1003.2(c)(2). Inasmuch as Tanzil limited his arguments to "changed circumstances" arising in Indonesia, the BIA could and did still entertain the motions. See id. § 1003.2(c)(3)(ii).

[3] Tanzil misidentifies the standard of review that should apply to his petition. In his brief, he asserts that "[t]his court reviews questions of law under the *de novo* standard"—later, he simplifies this to "[t]he Court's review is *de novo*"—and charges us with determining whether "[the BIA's] 'pattern or practice' determination did not apply appropriate standards for the definition of persecution and was made without full consideration of all evidence." Pet'r's Br. 9. While technically not incorrect insofar as review of law is concerned—indeed, if motions to reopen turn entirely on questions of law, we review the BIA's legal conclusions *de novo*, see Luntungan v. Att'y Gen., 449 F.3d 551, 555 (3d Cir. 2006)—Tanzil does little to situate his petition in such a category of case. Other portions of Tanzil's proffered standard would be more appropriate if we were reviewing his final order of removal, the time for which has long since passed. A motion to reopen is the proverbial second bite at the apple, whose disposition is generally based on internal regulations, BIA discretion, and a heavy dependence on fact, but nowhere in his briefs does Tanzil acknowledge (or, indeed, tailor his arguments to) our generally circumscribed level of review. Moreover, the abuse of discretion standard we apply in this context is neither novel nor obscure. See, e.g., Zheng v. Att'y Gen., 549 F.3d 260, 264–65 (3d Cir. 2008); McAllister v. Att'y Gen., 444 F.3d 178, 185 (3d Cir. 2006).

We would be inclined to attribute this to an error in drafting if not for Tanzil's insistence on adhering to his proffered *de novo* approach even after the Government pointed out his error. See Gov't's Br. 13; Pet'r's Reply Br. 2. In any case, Tanzil has not justified the use of any alternative standard of review, and we will proceed under abuse of discretion analysis.

5

III.

We cannot find that the BIA abused its discretion in declining to reopen proceedings on either occasion. First, Tanzil has not shown that the BIA shirked its duty to analyze the evidence before it. He argues that "[t]he two Board decisions at issue in this Petition do not provide substantive analysis of the information contained in the CERD Report, the NGO Report or the expert testimony," Pet'r's Br. 8, but immediately thereafter acknowledges that "[t]he first Board decision of December 29, 2009 . . . recited the evidentiary submissions." The BIA need not write an exegesis on every document submitted, see Wong v. Att'y Gen., 539 F.3d 225, 231 (3d Cir. 2008), and it is Tanzil's burden to show that the BIA actively failed to consider the evidence, see Abdulai v. Ashcroft, 239 F.3d 542, 550 (3d Cir. 2001). The BIA's recitation of the evidence suffices to show its consideration thereof, especially in tandem with statements like "[a] review of the report does not support [Petitioner's] contention." A.3; see also Toussaint v. Att'y Gen., 455 F.3d 409, 417 (3d Cir. 2006). An active demonstration of "substantive analysis" is not necessary; nor, for that matter, is coming to a conclusion contrary to the one favored by the Petitioner sufficient to show lack of consideration.

Moreover, some of the ostensible BIA decisions to which Tanzil objects do not appear to be reflected in the record. He asserts, for example, that the BIA placed "excessive weight on prior decisions that were based in older [State Department] Reports" instead of considering the new evidence submitted. Pet'r's Br. 12. One of the cases he identifies is Sioe Tjen Wong. But the BIA did not "rely" on the factual

6

background of Sioe Tjen Wong in the decisions that are the subject of this petition; instead, it cited the case to demonstrate this Circuit's rejection of the Ninth Circuit's "disfavored group" analysis. Nor do we find any record support for Tanzil's claim—which follows a broadside on the general reliability of State Department reports—that "[t]he approach of the Board in this decision . . . appears to be returning to the once-universally rejected primacy of the [State Department] Reports," or his similar contention that "the Board's finding essentially upholds its reliance on this Court's previous decisions that relied on those outdated and incomplete [State Department] Reports." Pet'r's Br. 19–20. The BIA's decisions were appropriately, and narrowly, confined to whether the new evidence presented demonstrated changed country conditions sufficient to warrant reopening, and we do not see where the BIA allegedly overspilled those boundaries.

Turning to the substantive merits of the evidence, we simply cannot agree with Tanzil that his submissions demonstrated changed country conditions, especially under the "clear probability" withholding of removal standard and our own deferential standard of review. The NGO report, which he describes as a "scathing" commentary on the Indonesian government's own summary of its record on human rights and discrimination, is far more equivocal and technical than he implies, and would appear to take issue with the government's response to past atrocities, the inefficiencies of Indonesia's court system with regard to discriminatory acts, and the pace of the government's implementation of liberalizing, democratizing, and integrating reforms—a noble critique,

7

to be sure, but not one showing changed country conditions implicating renewed persecution of ethnic Chinese.[4] Dr. Winters's testimony criticizes "piecemeal" reform efforts and predicts future violence, A.204–216, but is similarly inconclusive. In sum, the BIA did not abuse is discretion when it declined to reopen proceedings based on this evidence.

## IV.

For the foregoing reasons, we will deny the consolidated petitions for review.

---

[4] Nor do Tanzil's descriptions of the NGO report always jibe with its actual contents. In his motion to reopen, for example, Tanzil cited paragraph 166 of the report for the conclusion that "most victims of discrimination and these crimes are ethnically Chinese (a group barely mentioned in the Government report)." A.85. But the NGO report is less clear on this point, as it reports that "[m]ost victims are Chinese ethnic *and other ethnics/tribes specifically connected with their identity of their religion or belief*." A.174 (emphasis added).